**In the Matter of ZSA ZSA LIMITED, Bankrupt.**

**No. 70 B 736.**

United States District Court,
S. D. New York.

Dec. 29, 1972.

---

11. See Plaintiff's Exhibit #10.

Jacob Oliner, Trustee, pro se; Solomon P. Glushak, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, by Thomas F. Curnin, New York City, for Secured Creditors.

POLLACK, District Judge.

This is a petition to review a sale made on order of a Referee in Bankruptcy.

Prior to adjudication as a bankrupt and during proceedings pending against it under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., Zsa Zsa Limited (the debtor and presently the bankrupt) made a settlement with certain of its secured creditors, which recognized the security interest of those creditors in property of the debtor. The settlement was approved by the Referee administering the Chapter XI proceedings. Following this approval, the creditors sold the collateral at a judicially approved sale intended to liquidate the secured debt. That sale was unsuccessfully attacked before the Referee by a trustee in bankruptcy who was appointed after the settlement with the creditors but before the sale. The trustee contended that the sale was improperly conducted.

For the reasons shown hereafter, the objections to the sale are overruled and the order approving it is confirmed.

## I.

The settlement between Zsa Zsa and its secured creditors during the Chapter XI proceedings came before Judge Tenney on a petition to review the same. The settlement and the interests which emerged therefrom were upheld on the review. Judge Tenney traced the background as follows.

Zsa Zsa, Ltd. was in the cosmetics and allied products business. On September 23, 1970, it petitioned for a Chapter XI arrangement. First National City Bank (FNCB), at that time, held a security interest obtained July 23, 1970 covering all the personal property, inventory, and accounts receivable of the debtor; this interest secured advances to be made by FNCB to the debtor of the lesser of $450,000 or of an amount equalling 70% of the debtor's accounts receivable, taken at face value. Elmer and Donald Slavik and George Millay ("Slavik and Millay" hereinafter) [the present respondents], who controlled the debtor, were guarantors of this loan; however, a collateral agreement was entered simultaneously between the debtor and Slavik and Millay, under which the debtor was to indemnify Slavik and Millay for any payments made under their guarantee.

When the agreements were made, the debtor had already borrowed $65,000 from FNCB; in the summer of 1970, debtor borrowed an additional $225,000.

In October, 1970, Slavik and Millay entered into an agreement with Mc-Brides Industries ("McBrides"), under which McBrides was to assume management control of the debtor; this agreement looked towards a merger between Zsa Zsa and McBrides, following the former's discharge from Chapter XI.

In December, 1970, FNCB went against Slavik and Millay, as guarantors, when the debtor failed to comply with the loan agreement. Slavik and Millay paid a remaining balance of $253,981.86, plus interest of $5,795. FNCB simultaneously assigned debtor's notes and FNCB's security interest to Slavik and Millay.

On June 11, 1971, Slavik and Millay moved in the arrangement proceedings for a foreclosure on the debtor's assets, pursuant to the assigned security interest. The debtor and the secured creditors agreed to a settlement which the referee approved on October 28, 1971. A reopening sought by a general creditor was denied and the settlement was reaffirmed on December 3, 1971. In the settlement Zsa Zsa recognized the security interest of Slavik and Millay in the amount of $300,000. As previously stated, the settlement was upheld by Judge Tenney on a review of the Referee's approval. A Trustee in bankruptcy was appointed on February 2, 1972 when Zsa Zsa was adjudicated a bankrupt. While the petition for review of the settlement made during the Chapter XI proceedings was pending, the sale now in question was made, *viz.*, in March, 1972.

## II.

The validity of the sale in question depends on whether the facts and circumstances of the sale establish that it was held in a commercially reasonable manner. N.Y.U.C.C. § 9–504(3). A review thereof shows that the instant sale satisfies this standard.

The conditions for the sale were molded in a series of communications between the secured creditors' counsel and the trustee and in an adversary hearing held before the Referee on March 6, 1972. Originally, the creditors had planned a private sale of the collateral upon written bids at the offices of their counsel. However, creditors' counsel, in order to minimize opposition to the sale and purportedly to secure the highest possible price, recommended a public sale.

A public sale was scheduled for March 8, 1972; however, prior thereto, on March 6, upon motion of the Trustee, a hearing was held before the Referee to consider the terms of the planned public sale. At that hearing, there was thorough discussion of major aspects of the prospective sale and an uninhibited op-

portunity to be heard on any and all terms of the sale. The trustee objected to the inclusion of accounts receivable in the collateral to be sold, argued that the credit terms to be extended to potential purchasers should not be left to the sole discretion of the secured creditors, claimed that a bulk sale of this collateral would discourage bidders, and criticized the time and notice being given for the sale. The trustee did not, however, object to a public sale of any of the collateral except the accounts receivable. Assuming *arguendo* a reversal on appeal of Judge Tenney's approval of the settlement between the debtor and its secured creditors, the trustee concedes that he nonetheless would proceed with a similar sale of the assets (excepting the accounts). Although he makes a point of the matter at this time, the trustee did not, at that hearing before the sale, request any representation from the secured creditors to the effect that the inventory lists which were open for inspection were accurate.

As a result of the pre-sale hearing, and adopting the request of the trustee, the date of sale was postponed until March 10, to allow further time for publicity, planning, and inspection. Furthermore, the wording in the public notice of sale was modified at the Referee's instance to more sharply reveal that the sale was subject to be confirmed by the Referee. Moreover the creditors agreed to offer the goods both in bulk and smaller lots, and the Referee agreed to consider approval of the sale as a check on the creditor's discretion over credit terms.

The prospective sale was then publicly advertised. Public notice thereof appeared in *The New York Times*, on each of March 2, 5, 8 and 10, 1972. The notice adequately described the types of goods to be sold, specified the conditions of sale, referred to documents and samples which bidders could inspect prior to the sale date, and indicated that the sale was subject to the Referee's confirmation. An inventory list as of January 31, 1972 was available for inspection both at the bankrupt's warehouse and at the auctioneer's New York office; samples of the inventory were available for inspection at the warehouse on five dates before the sale.

The sale took place on March 10 at 24–32 46th Street, Astoria, Queens, where the debtor's main inventory was located. Stanley Straus, President of David Straus & Co., Inc., an auctioneer with approximately 25 years experience, conducted the sale. Fourteen people registered their presence at the sale.

The terms of the sale provided for both bulk and lot bidding, with the specific proviso that the seller could reject bids aggregating less than $300,000 for the full estate sold. For the purposes of the sale, the debtor's property subject to the security agreement was grouped into five lots. Lot # 1, the key part of the estate, consisted of finished cosmetics and works in progress—generally described as the physical inventory—including treatment and body creams, fragrances, lipsticks and lipstick refills, liquid make-ups and make-up creams, and unspecified additional items. Lot # 2 included components such as boxes, labels, etc.; Lot # 3, office furniture; Lot # 4, warehouse equipment; and Lot # 5, accounts receivable.

At the sale, the auctioneer first solicited bulk bids for the entire collateral. McBrides bid $300,000, the minimum amount set by the terms of sale and an amount identical to the offer McBrides had submitted when the private sale was considered. No other bulk bids were made and the auctioneer proceeded to call for bids on each of the five specified lots. Again, McBrides was the sole bidder, offering by lot an aggregate of $77,500. Pursuant to the terms of sale, the lot bids were then ignored, and the bulk bid of $300,000 was accepted. For this bid, McBrides acquired, in addition to the items in lots # 2–5, an inventory given an estimated retail value of $3.5-million, a wholesale value of $1.5-million, and a cost value of $500,000.

On March 21, 1972, a hearing was held before the Referee to determine whether the sale should be confirmed. The trustee contended that the advertisement run in *The New York Times* was insufficient in terms of timing and content; that the size of the lots was too large and their composition too varied to attract a large buying public; that the boxes containing the inventory should have been opened for full inspection; and that the failure of the auctioneer to represent that the January 31, 1972 inventory lists shown to the bidders were accurate in all respects discouraged active bidding. Additionally, the trustee alleged that the public sale was rigged to insure the passage of the assets to McBrides, which had announced plans to carry on the sale of the Zsa Zsa line through a subsidiary, Zsa Zsa International. Slavik and Millay— as principals of the bankrupt, as secured creditors of the bankrupt, and as purported principals of the purchaser—are portrayed by the trustee as playing conflicting roles in these transactions.

The creditors responded that the sale conformed both to the terms of the security agreement of July 23, 1970, which created the interest assigned to the respondents herein, and to the requirements of the Uniform Commercial Code. Furthermore, the creditors contended that nothing in the record demonstrated bad faith on their part or provided evidence of fraud or of unfairness.

The auctioneer who conducted the sale testified that it conformed to reasonable commercial practices. He testified that separate lots which separated items of physical inventory would not have brought a better price in this situation, since diverse cosmetic goods are seen as more valuable when bought in bulk. Furthermore, the auctioneer stated that while only $300,000 was received for goods with a supposed cost exceeding $500,000 and a supposed wholesale value over $1.75-million, a 10–15% salvage was quite fair. The auctioneer testified that he had been instructed to accept the highest bid made, and that he anticipated more than one bid. Additionally, the auctioneer by affidavit filed with the Referee pointed to the well displayed advertisements in the *Times,* the provision of eight days' notice before the sale, the availability of inspection for five days, the use of lot bidding as an alternative method, and the situs of the sale at the warehouse where inventory was stored as indicators of commercial reasonableness.

Upon the record of this hearing and the arguments and proof submitted therein, the Referee confirmed the sale on March 23, 1972.

Since the confirmation of the sale McBrides has disposed of most of the inventory in the regular course of its business.

The trustee challenges the Referee's order on the ground that the Referee denied a one day adjournment request from the trustee for the purpose of gathering additional evidence on potential bids. On this point, suffice to say that the trustee has not provided any proof that such additional evidence would alter the decision in this case and, in any event, the Referee's ruling was within the sphere of his discretion. 1 Collier, Bankruptcy ¶ 1.09 (14th ed.) (1971).

### III.

The sale of collateral, upon default, is controlled by § 9–504, N.Y.U.C.C., providing:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but *every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.* (Emphasis added).

Commercially reasonable, although a repeated term in the Code, is not specifically defined; rather, the draftsman deferred to case law for the development of a precise meaning. 1 Coogan, Hogan

& Vagts, Secured Transactions under U.C.C. (1968), § 8.04[2][a]. That development is just under way.

However, some general criteria can be gleaned from § 9–507, which provides penalties for non-compliance with the rules governing disposition of collateral. That section provides in pertinent part:

*The fact that a better price could have been obtained* by a sale at a different time or in a different method from that selected by the secured party *is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner.* If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of dispositions. *A disposition which has been approved in any judicial proceeding* or by any bona fide creditors' committee or representative of creditors *shall conclusively be deemed to be commercially reasonable,* but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable. (Emphasis added).

Section 2–706, dealing with a seller's remedies for breach of contract by a buyer, sheds some further light on commercial reasonableness. Subsection (4) requires goods to be sold to be available for inspection; further requires reasonable notice and location; and limits sales to identified goods, unless trading in futures is appropriate for the goods involved.

Additionally, the Code makes clear that the fact that the secured party is the purchaser of the collateral does not demonstrate a lack of commercial reasonableness. § 9–504(3).

Relying on pre-Code law, the trustee pins his legal argument upon the assumption that the model for the commercially reasonable sale is a public auction with free and open bidding; this model presumes fair competitive bidding by the greatest number of interested purchasers. No authority is cited to show this should be the Code standard; the terms of the statute, by recognizing private sales and by enumerating certain types of sales as conclusively reasonable, recognizes other alternatives. Nevertheless, the thrust of the trustee's argument—that the opportunity to inspect was insufficient and conditions were improper to attract a spectrum of bids—can be evaluated against the aspects of manner, method, time, place and terms specified by the Code.

The creditors in their brief specifically argue that each of these aspects was performed in a commercially reasonable fashion. While some authority is provided for each aspect to support each condition of the present sale, there are no dispositive holdings by the highest appellate court of any state; and, of the lower court cases cited herein, none controls the instant situation. It is the aggregate of circumstances in each case—rather than specific details of the sale taken in isolation—that should be emphasized in a review of the sale. The facets of manner, method, time, place and terms cited by the Code are to be viewed as necessary and interrelated parts of the whole transaction.

Thus, in Eaton, Yale & Towne, Inc. v. Sherman Industrial Equip. Co., 316 F. Supp. 435, 444–445 (E.D.Mo.1970), the Court found the sale commercially reasonable in the following situation. Ten days prior to the sale, two sets of ads ran in St. Louis papers and additional ads ran in surrounding major cities; circulars were also mailed to likely bidders. An experienced auctioneer was hired to direct the sale, which was held at the warehouse containing the goods.

Inspection was available for two days, and the items were tagged and catalogued. At the sale, 55 bidders registered and the auction lasted 2½ hours; the number of actual bids is not reported. The Court specifically held that a sale could properly be made in bulk, in lot or in parcels, and that the secured party could buy at the auction.

Some Courts equate commercial reasonableness with a method designed to snare the highest possible price. A to Z Rental, Inc. v. Wilson, 413 F.2d 899 (10th Cir. 1969); Dynalectron Corp. v. Jack Richards Aircraft Co., 337 F.Supp. 659, 663 (W.D.Okla.1972). In the latter case the sale was held unreasonable, as no effort was made to publicize the sale; rather, the seller "merely took the quick and easy way out by selling the aircraft to the same people who had been using it."

Extensive treatment of the meaning of commercial reasonableness is found in Old Colony Trust Company v. Penrose Industries Corp., 280 F.Supp. 698, 711–718 (E.D.Pa.) (Van Dusen, C. J., by designation), aff'd, 398 F.2d 310 (3d Cir. 1968). There, the Court granted a declaratory judgment that a *private* sale arranged by senior secured creditors was commercially reasonable since the price and terms of that sale resulted from good faith negotiation and proper business conduct. The Court held that commercial reasonableness carried an element of good faith conduct, as well as a pragmatic need to advance the interests of all involved parties. Quoting Hogan, The Secured Party and Default Proceedings Under the UCC, 47 Minn.L.Rev. 205, 219–20 (1962), the Court stated:

Commentary on Article 9 has convincingly pointed out that "[t]he policy of Article 9 is to provide a simple, efficient, and flexible tool to produce the maximum amount from the disposition of the collateral." To effectuate this, § 9–504 "attempts to chart a path in the narrow area between two policy positions—one a desire to impede dishonest dispositions, and the other, a reluctance to strangle honest transactions with red tape."

The language of § 9–507 reveals that the primary focus of commercial reasonableness is not the *proceeds* received from the sale but rather the *procedures* employed for the sale. If the secured creditor makes certain that conditions of the sale, in terms of the aggregate effect of the manner, method, time, place and terms employed conform to commercially accepted standards, he should be shielded from the sanctions contained in Article 9. The present case, while arising in an unusual bankruptcy context since the Referee agreed to confirm the sale as a check on the discretion of the secured parties over credit terms, does not require deviation from the spirit and the substance of this test.

The present sale, however, is not beyond review. The price received, $300,-000, falls substantially short of the estimated alleged retail value in a going concern context, placed in excess of $3.5-million. A wide discrepancy between the sale price and the value of the collateral signals a need for close scrutiny, *cf.* Dopp v. Franklin National Bank, 461 F. 2d 873, 878 n. 13 (2d Cir. 1972), even though a seemingly low return is usually not dispositive on the question of commercial reasonableness. § 9–507. Such scrutiny is especially appropriate where self dealing is alleged.

While the amount received provides only about 10 cents on the dollar, the testimony of the auctioneer that this is a fair return, an affidavit of defense counsel furnished at the request of the Court, and the price that another purported bidder was willing, according to the trustee, to offer ($350,000) convinces the Court that the price is not unreasonable. The $300,000 paid satisfied the minimum bid established under the terms of sale, which terms were reviewed by the Referee at the March 6 hearing. That the buyers are closely related to the sellers is not a disqualifying circumstance. § 9–507.

672

Close scrutiny satisfies the Court that the instant sale meets the requirement of commercial reasonableness, as that standard has developed for sales of collateral under the U.C.C. The sale herein had the benefit of judicial guidance. While the sale was not made pursuant to a detailed plan of the referee, the hearing before the referee did pass the plans through a judicial filter. When there has been such a hearing all interests have an opportunity to comment upon the arrangement for disposition of the collateral, and this should raise the presumption that the sale is commercially reasonable. *Cf.* 9–507(2). Moreover, the conditions of the sale, as modified, were reasonable in terms of notice, manner, place, time, method and terms of sale. The code requires reasonableness; it does not make the secured party an insurer of a hypothetical expected return.

Accordingly, the Referee's order confirming the sale is, in all respects, approved and confirmed.

So ordered.