**FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver of Peoples Bank of the Virgin Islands, Plaintiff**

v.

**ROAN CREQUE, formerly d/b/a Peoples Laundromat, Defendant**

# Civil No. 1396/1977
# Territorial Court of the Virgin Islands
### Div. of St. Croix at Christiansted
# July 31, 1979

JEAN–ROBERT ALFRED, ESQ., Christiansted, St. Croix, V.I., *for plaintiff*

RICHARDS & MAYNARD (DESMOND L. MAYNARD, ESQ., of Counsel), Charlotte Amalie, St. Thomas, V.I., *for defendant*

FINCH, *Judge*

## MEMORANDUM OPINION, FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

### I. INTRODUCTION

Presented here is an action for debt by a secured creditor seeking a deficiency judgment after the repossession and sale of the collateral. Plaintiff, the Federal Deposit Insurance Corporation (hereinafter referred to as "FDIC"), is the receiver of Peoples Bank of the Virgin Islands (hereinafter referred to as "Peoples Bank"). Defendant, Roan Creque (hereinafter referred to as "Creque" or "defendant"), is the former owner and operator of Peoples Laundromat, which was once located Plot 28, Estate Monbijou, St. Croix. This matter arose out of Creque's default on a promissory note he delivered to Peoples Bank in 1975. While Creque does not contest the fact that he defaulted on his note, he asserts that the FDIC disposed of the collateral on his obligation in a commercially unreasonable manner. For the reasons shown hereafter, this Court finds and concludes that judgment should be entered for plaintiff and against defendant.

This Court has heard the testimony of the witnesses, considered the pleadings and documents introduced into evidence, reviewed the applicable law and has been otherwise fully advised in the premises herein. The following represents this Court's findings of fact, discussion, and conclusions of law.

## II. FINDINGS OF FACT

1. On February 24, 1975, Peoples Bank loaned Creque $26,808.36. This debt was evidenced by a promissory note executed by Creque and delivered to Peoples Bank on the same day.

2. The loan was to be repaid in forty-four (44) monthly installments of $757.00 each, including interest at the rate of twelve percent (12%) per annum.

3. Also, on February 24, 1975, Peoples Bank and Creque entered into a security agreement covering twenty (20) washers, ten (10) dryers, all machinery, equipment, inventory, after acquired items and the proceeds of collateral.

4. Creque granted Peoples Bank and its successors and assigns this security interest to secure the repayment of his promissory note.

5. Creque made the payments due on the promissory note until June 2, 1975. The evidence is undisputed that no payments were made subsequent to the June 2, 1975, payment.

6. Testimony was given at the trial that as of June 2, 1975, the principal balance on the loan was $24,590.71, and that the accrued interest was $2,708.66 as of April 30, 1976.

7. Creque operated Peoples Laundromat until March 30, 1976. On March 31, 1976, or on April 4, 1976, Creque voluntarily surrendered the keys of Peoples Laundromat to the FDIC. The exact date on which this surrender occurred cannot be determined due to Creque's conflicting testimony in this regard.

8. Prior to surrendering the keys of Peoples Laundromat to the FDIC, Creque attempted to sell Peoples Laundromat to various persons. There is evidence in the record which indicates that Creque intended to sell Peoples Laundromat to one Mr. Daly for $35,640.60 and to one Mr.

Lowell Schuster for $48,240.00. However, the record is devoid of any actual offers to purchase made by Mr. Daly or by Mr. Lowell Schuster.

9. The record reveals that only one actual offer to purchase was made. This offer was made by one Mr. Lloyd Henry. There was an agreement entered into between Lloyd Henry and Creque whereby Lloyd Henry was to pay Creque $5,000 in cash for Peoples Laundromat and was to assume the balance due on Creque's promissory note to Peoples Bank.

10. The FDIC approved of this agreement; however, the sale of Peoples Laundromat to Lloyd Henry was not consummated due to Creque's intransigent refusal to remain liable on his promissory note. In the deposition of Lloyd Henry, which this court took judicial notice of at trial, Creque himself explained quite convincingly how he refused to go through with the sale of Peoples Laundromat to Lloyd Henry because he was not being released of liability on his promissory note.

11. Creque left St. Croix on April 4, 1976, to go to Puerto Rico to be initially treated in preparation for chest surgery. After receiving this initial medical treatment, he moved to St. Thomas.

12. Creque spent four months in a hospital in Puerto Rico during the year 1976. The record fails to reveal which four months of 1976 Creque spent in the hospital.

13. Subsequent to April 21, 1976, when the sale of Peoples Laundromat to Lloyd Henry failed to go through, the FDIC repossessed the collateral of Peoples Laundromat. The exact date of repossession is unavailable from the record.

14. The FDIC then began to take steps to dispose of the collateral. An appraisal of the collateral was done by the firm of Erikson, Schindler, and Hamilton Associates. This

appraisal was done for the FDIC and it appraised the value of the collateral of Peoples Laundromat at $8,365.00.

15. Mr. Delroy Miller, an employee of the FDIC, testified that the FDIC first attempted to dispose of the collateral by soliciting written bids, but that this attempt was unsuccessful.

16. The sale of the collateral was then advertised in "The St. Croix Avis" for four consecutive weeks, namely, the weeks of September 15, 22, 29 and October 6 of 1976. This notice of sale of the collateral was addressed to "Roan Creque d/b/a Peoples Landromat" and it listed all the collateral that was to be sold. The notice of sale further provided that offers would be accepted from the highest bidders, and that the sale would be held at Peoples Laundromat on October 13, 1976, at 2:00 p.m.

17. At approximately 2:00 p.m. on October 13, 1976, pursuant to the terms of the security agreement delivered by Creque to Peoples Bank in 1975, a liquidation sale of the collateral was conducted at public auction on the premises of Peoples Laundromat.

18. The sale was conducted by Mr. Gary Holloway, Liquidator-at-Large for the FDIC. Mr. Delroy Miller attended the sale in his capacity as Liquidator Assistant for the FDIC. Approximately twenty-five to thirty persons attended the sale. At least two representatives from two local laundromats attended the sale.

19. At the sale, there was an attempt to liquidate the collateral on an individual basis first. This attempt consisted of a method whereby each particular piece of equipment was offered individually to the persons present at the sale who would then bid upon the particular item offered.

20. The bids received on the aggregate number of the individual pieces of equipment amounted to $3,591.00. These bids were rejected because their sum was felt to be

too low as compared to the appraisal that had been done by Erikson, Schindler & Hamilton Associates.

21. The equipment was then offered on a bulk basis and a bid of $4,500 was received. This bid was accepted and the equipment was sold for that amount.

22. Prior to the sale, the FDIC had placed security guard dogs at the premises of Peoples Laundromat in order to protect the collateral from vandalism or theft. The cost for this security amounted to $500.00. Costs for the advertisements of the sale and the Erikson, Schindler & Hamilton Associates appraisal were $144.00 and $200.00 respectively. Therefore, the FDIC incurred total costs of $844.00 in this matter.

23. As of November 18, 1976, the accrued interest due on the outstanding balance of Creque's promissory note amounted to $4,341.77. On that date, the proceeds of the sale were applied against this accrued interest. The remaining sale proceeds, $158.21, were then deducted from the $844.00 that the FDIC had incurred for security and sale costs, leaving a deficit balance of $685.77 for costs.

24. Creque did not attend the sale. He contends that at the time of the sale, he was in the hospital in Puerto Rico. He further alleges that Gary Holloway of the FDIC and one Earl Lang, also of the FDIC, knew where he was, that they knew he was in the hospital in Puerto Rico. However, at no time did Creque ever indicate exactly where he was hospitalized in Puerto Rico. Creque likewise failed to show that he furnished the FDIC with any definite address concerning his hospitalization in Puerto Rico.

25. At trial, Creque testified that he first learned of the sale of the collateral of Peoples Laundromat sometime in 1978, when he called Gary Holloway to inform him that there was a person who was interested in purchasing Peoples Laundromat. This testimony is clearly incredible

since Creque answered the FDIC's complaint in this action on November 11, 1977.

26. Creque also testified that when he left St. Croix on April 4, 1976, the equipment of Peoples Laundromat was in excellent operational condition and that, in his opinion, it was at that time worth more than the $4,500 sales price received in October 1976 by the FDIC. However, Creque failed to introduce any evidence to support his opinion.

27. Any additional findings of fact made in the introduction and discussion sections of this memorandum opinion are incorporated herein by reference.

### III. DISCUSSION

The core inquiry presented by this case is whether there was a commercially reasonable disposition of the collateral in question pursuant to § 9—504(3) of the Uniform Commercial Code as adopted by 11A V.I.C. § 9—504(3) :[1]

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this territory or who is known by the secured party to have a security interest in the collateral.

---

[1] Except for Article 10 which merely provides for the effective date of enactment, the Uniform Commercial Code was adopted in the Virgin Islands, with minor changes from the 1962 Official Text, by Act of February 19, 1965, No. 1299. 11A V.I.C. § 1—101. The Uniform Commercial Code comprises all of Title 11A of the Virgin Islands Code. All citations hereafter are to the Uniform Commercial Code only, since the Virgin Islands version of this statute is numbered similarly.

The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.

Section 9—504 of the Uniform Commercial Code (hereinafter referred to as the "Code") authorizes a secured party, after the debtor's default, to sell or otherwise dispose of any or all of the collateral publicly or privately so long as every aspect of the disposition is commercially reasonable. Where the secured creditor repossesses and sells the collateral for less than the balance due on the indebtedness, the debtor is liable for the remaining deficiency unless it was otherwise agreed. U.C.C. § 9—504(1). However, the creditor is precluded from obtaining a deficiency judgment where the sale of the collateral was conducted in a manner that was not commercially reasonable.[2] 4 R. Anderson, Uniform Commercial Code: Secured Transactions § 9—504:30 at 623 (2d ed. 1971). But where the sale of the collateral was conducted in compliance with § 9—504(3) of the Code, then the sum received at the sale is evidence of its true market value. Id. at 624.

Although the phrase "commercially reasonable" appears repeatedly throughout the Code,[3] it is not specifically defined. Rather, the Code's draftsmen deferred to the development of decisional law for a precise meaning. C.I.T. Corp. v.

---

[2] This Court notes that this is the majority rule where the value of collateral is at issue. A minority of courts hold that a secured creditor who has disposed of collateral in a commercially unreasonable manner is not denied the right to recover a deficiency judgment. E.g., Clark Leasing Corp. v. White Sands Forest Prod. Inc., 87 N.M. 451, 535 P.2d 1077 (1975); Colorado Management Ass'n. of Colorado Sp. v. Tousley, 32 Colo. App. 33, 505 P.2d 1314 (Ct. App. 1973); Universal C.I.F. Corp. v. Rone, 248 Ark. 665, 453 S.W.2d 37 (1970). Under this minority rule the amount received at sale is *not* evidence of its market value and a presumption is raised, which the creditor must rebut by introducing other evidence, that the value of the repossessed collateral was worth at least the amount of the outstanding debt.
This court will adhere to the majority rule.

[3] E.g. §§ 2—103(1), 2—103(6), 2—311(1), 2—510(3), 2—609(1), 2—610(a), 2—614(1), 2—704(2), 2—706, 2—710, 2—715(1), 3—406, 3—419(3), 7—210(1), 7—308(1), 7—404, 9—318(2), 9—502(2), 9—504(3), 9—507(2).

Lee Pontiac Inc., 513 F.2d 207, 209 (9th Cir. 1975), citing 1 Coogan, Hogan & Vagts, Secured Transactions Under U.C.C., § 8.04(2)(a) (1968). In searching for a specific definition of the term "commercially reasonable" as it appears in § 9—504(3), some courts have found interpretive guidance in paragraph 4 of the Official Comment to the analogous § 2—706 in the sales article of the Code. See, e.g., United States v. Terrey, 554 F.2d 685, 694 (5th Cir. 1977); Old Colony Trust Company v. Penrose Industries Corp., 280 F.Supp. 698, 712 (E.D. Pa.), aff'd., 398 F.2d 310 (3d Cir. 1968). Section 2—706 allows a seller to resell goods, by means of public or private sale, after breach of contract by the buyer so long as every aspect of the resale is "commercially reasonable." Paragraph 4 of the Official Comment to § 2—706 contains the definition of "public" sale, states how a "private" sale may be effected, and maintains that it is the object of the commercial reasonableness standard to obtain the maximum price possible in the circumstances whenever there is a resale. The paragraph provides:

4. Subsection (2) frees the remedy of resale from legalistic restrictions and enables the seller to resell in accordance with reasonable commercial practices so as to realize as high a price as possible in the circumstances. By "public" sale is meant a sale by auction. A "private" sale may be effected by solicitation and negotiation conducted either directly or through a broker. In choosing between a public and private sale the character of the goods must be considered and relevant trade practices and usages must be observed.

U.C.C. § 2—706, Official Comment, para. 4.

■ The court in In re Zsa Zsa Limited, 352 F.Supp. 665 (S.D.N.Y. 1972), aff'd. without op. 475 F.2d 1393 (2d Cir. 1973) shed some further light on the subject of commercial reasonableness by indicating how the standard is to be evaluated:

It is the aggregate of circumstances in each case—rather than specific details of the sale taken in isolation—that should be emphasized in a review of the sale. The facets of manner, method, time, place and terms cited by the Code are to be viewed as necessary and interrelated parts of the whole transaction.

Id. at 670.

In the instant action, the FDIC introduced evidence as to the manner, method, time, place and terms of the sale. Prior to the sale, FDIC obtained an independent third-party appraisal of the collateral. The sale was also preceded by public advertisement which adequately identified and described the collateral to be sold and which sufficiently specified the conditions of sale, was held at a reasonable time at the site where the collateral was located, was conducted by auction, and was attended by approximately twenty-five to thirty prospective buyers. At least two of the prospective buyers present at the sale were representatives of local laundromats, which indicates that the notification employed by the FDIC reached persons operating the same type of business as that formerly operated by Creque.

 Prior to liquidating the collateral by public sale, the FDIC had attempted to dispose of it by private sale via written solicitations. When this attempt failed due to poor response, the public sale was employed. Moreover, the FDIC sold the collateral on a bulk basis only after it determined that the bulk bid exceeded the sum of the highest bids received for the individual pieces of equipment. Therefore, the FDIC's choice of a public sale on a bulk basis was clearly consonant with the commercially reasonable goal of obtaining the highest price possible in the circumstances. See, U.C.C. § 2—706, Official Comment, para. 4; Old Colony Trust Company, supra, 280 F.Supp. at 717. In this case, the FDIC conclusively demonstrated not only that the manner and method of the type of sale it ultimately utilized was designed to realize the maximum amount of collateral

in the circumstances, but also that no higher price was obtainable in a sale of the same method in October 1976 when the sale was made.

■ When faced with the preceding evidence adduced by the FDIC, defendant attempted to demonstrate that a higher price was obtainable by the Henry agreement to buy Peoples Laundromat. In April 1976, Lloyd Henry was going to buy Peoples Laundromat for $5,000.00, payable in cash to the defendant, and then assume the balance on the defendant's promissory note. However, the defendant thwarted this sale because he refused to remain liable on his promissory note. "[A]s a matter of law it would seem against good commercial practice to force a secured party to realize on his collateral only on the debtor's terms." Old Colony Trust Company v. Penrose Industries Corp., 280 F.Supp. at 717. The defendant's own testimony shows that he consistently and continuously objected to and opposed any sales agreement wherein his name was not excluded from his promissory note. It is clear from the record herein that the defendant would have been spared from the financial predicament with which he is now faced had he chosen to cooperate fully. In this respect, the defendant is not unlike the child in the well-known adage who murders his parents and when prosecuted for his offense, pleads the court to grant him clemency because he is an orphan.

In considering defendant's allegation that the price received by the FDIC for the collateral of Peoples Laundromat was unreasonable, this court looks to § 9—507(2) of the Code, which further amplifies the meaning of the commercial reasonableness standard and which provides:

(2) *The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner.* If the secured party either sells the collateral in the usual manner in any

recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable. [Emphasis supplied.]

■ This court analyzes the above-quoted section of the Code as did the court in In re Zsa Zsa Limited, supra:

The language of § 9—507 reveals that the primary focus of commercial reasonableness is not the *proceeds* received from the sale but rather the *procedures* employed for the sale. If the secured creditor makes certain that conditions of the sale, in the terms of the aggregate effect of the manner, method, time, place and terms employed conform to commercially accepted standards, he should be shielded from the sanctions contained in Article 9 [of the Code].

352 F.Supp. at 671.

Thus, the reasonableness of an Article 9 liquidation is determined by considering all aspects of the sale and not just the price ultimately received for the collateral. See, James Talbott, Inc. v. Reynolds, 165 Mt. 404, 529 P.2d 352, 355 (1974). Consequently, in the case at bar, defendant's attempt to establish the unreasonableness of the sale via the introduction of evidence establishing that a higher price could have been realized by the Henry agreement failed. Defendant failed to show any unreasonableness by this manner of proof because § 9—507(2) explicitly provides that a showing such as that made by the defendant here is insufficient, by itself, to determine that a sale was commercially unreasonable. Even assuming, however, that § 9—507(2) would deem the showing of a later obtainable

price sufficient to determine commercial unreasonableness, it would nonetheless be of no avail to defendant under the particular circumstances of this case. This would be so because, as noted earlier, the sale of Peoples Laundromat to Lloyd Henry did not go through due to the limits wilfully imposed by defendant.

At trial, defendant's counsel, in attempting to dispute the reasonableness of the sale of collateral because the price received therefor was allegedly less than its fair market value, placed great reliance on Mercantile Financial Corp. v. Miller, 292 F.Supp. 797 (E.D. Penn. 1968). In Mercantile, the property involved, according to the defendant therein, had a fair market value of $750,000.00 but was sold by the plaintiff for approximately $19,000.00. The purchaser at the sale subsequently resold the collateral for $57,000.00. The court found that the sale was commercially unreasonable for the following reasons:

(1) Only one party was present at the sale and the secured party knew in advance of the sale that only that party would be present;

(2) The secured party did not generally advertise the sale but conducted the auction with only a minimal amount of publicity at one of the three sites where the secured assets were located; and

(3) The wide disparity between the price originally paid for the assets, $750,000.00, and the price received for them at sale, $19,000.00, coupled with the showing that the assets were subsequently resold for $57,000.00, strongly indicated that the secured party had failed to obtain the fair market value of the assets at the time of the sale.

Referring to the latter consideration, the court in Mercantile observed:

Although § 9—507(2) clearly provides that a discrepancy between a price received by a creditor disposing of assets pursuant to § 9—504 and an isolated price later shown to have been obtainable, is not alone sufficient to grant a debtor affirmative relief under § 9—507(1), certainly, such a discrepancy, if substantial, is relevant to a determination of whether a challenged sale was "commercially reasonable". [Citations omitted.]

Id. at 801.

The Mercantile case varies from that at hand in that here at least twenty-five persons attended the sale following adequate and sufficient public advertisement. Mercantile is further distinguishable from the case at bar because there has been no allegation of collusion or underhandedness made against the secured creditor in this case. For these reasons, the Mercantile case is inapplicable to the matter sub judice.

In any event, Mercantile did not hold that a substantial disparity between the value of the secured collateral sold and the amount of proceeds realized from its disposition conclusively demonstrates a lack of commercial reasonableness. Mercantile simply held that a significant discrepancy between the value of the collateral sold and the price received therefor in an Article 9 liquidation sale is usually not dispositive, but that such discrepancy, *along with other issues*, i.e., other substantial irregularities, may be considered in determining whether or not the sale was commercially reasonable.

Defendant's counsel also cited Braswell v. American National Bank, 117 Ga. App. 699, 161 S.E.2d 420 (1968), Norton v. National Bank of Commerce of Pine Bluff, 240 Ark. 143, 398 S.W.2d 538 (1966), and Baber v. Williams Ford Company, 239 Ark. 1054, 396 S.W.2d 302 (1965), in support of his argument that the sale of the collateral of Peoples Laundromat was unreasonable due to a disparity between its alleged value and sale price. In all these cases the courts found commercial unreasonableness and in all of them there was a discrepancy between the sale price of the collateral involved and its market value. However, none of these cases held that there was a lack of commercial reasonableness merely because of the discrepancies in sale prices and market values, as defendant's counsel would have this court believe. Such an interpretation is a nar-

row and tortured one, for these cases are "notice" cases involving the requirement of reasonable notification to the debtor under § 9—504(3) of the Code.[4] As will be seen hereafter, the notice employed in the present case was reasonable. Thus, the previously stated notice cases which defendant's counsel is urging this court to follow are not controlling in the matter sub judice.

■■ With reference to the notice issue, defendant testified at trial that he received no notice of the sale until 1978. Furthermore, his attorney contended that the law mandates actual notice.[5] Even if defendant's testimony with respect to notice were true, which this court does not concede, his attorney's position regarding an actual notice requirement is clearly erroneous. There is no requirement under the Code that the debtor must receive actual notice of the sale; the Code only requires that the secured creditor take reasonable steps to assure that the debtor is notified. James Talbott, Inc. v. Reynolds, 165 Mt. 404, 529 P.2d 352, 355 (1975); U.C.C. § 1—201(26).[6] So the question here is not whether Creque actually received notice of the sale prior to its occurrence, but rather, whether the FDIC proceeded properly and reasonably in giving notice. Creque's own testimony showed that he was absent from this jurisdiction at the time of the sale and that when he

---

[4] Braswell v. American National Bank, 117 Ga. App. 699, 161 S.E.2d 420 (1968) (failure to prove notice of sale in action for deficiency judgment precluded lower court from granting summary judgment in favor of secured creditor); Norton v. National Bank of Commerce of Pine Bluff, 240 Ark. 143, 398 S.W.2d 538 (1966) (private sale held commercially unreasonable where bank failed to notify defaulting debtor of repossessed automobile and car dealer who assigned conditional sales contract to bank agreeing to repurchase if buyer defaulted; car dealer deemed to be a "debtor" under § 9—504(3); Baber v. Williams Ford Motor Company, 239 Ark. 1054, 396 S.W.2d 302 (1965) (question of whether letter sent to defaulting debtor was reasonable notice under § 9—504(3) of the Code held to be one for jury).

[5] Tr. 160.

[6] U.C.C. § 1—201(26) provides:
A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.

490

voluntarily surrendered the collateral of Peoples Laundromat to the FDIC, he notified it that he would be absent from this jurisdiction. While Creque's voluntary surrender of the collateral did not release the FDIC from its obligation to proceed in a commercially reasonable manner, the fact remains that the FDIC did not know of his exact and precise whereabouts during the time in question. This justified the FDIC's use of notice by publication. Consequently, under the distinctive facts of this case, notice by publication was sufficient to satisfy the requirement of reasonable notification under the Code.

## CONCLUSIONS OF LAW

1. Any other conclusions of law made in the discussion section of this memorandum opinion are incorporated herein by reference.

2. This court has jurisdiction over the subject matter herein and of the parties to this action.

3. The FDIC has proven, by a preponderance of the evidence, that Creque is indebted to it in the amount of $685.77 for sales costs, and $24,590.71 as principal balance as of June 2, 1975 plus interest thereon until date of judgment, minus proceeds of the sale.

4. Notice of the sale in The St. Croix Avis for the four weeks preceding the sale satisfied the requirement of reasonable notification under § 9—504(3) of the U.C.C.

5. The FDIC has proven, by a preponderance of the evidence, that the sale of the collateral of Peoples Laundromat was a reasonable commercial disposition which satisfied the requirements imposed by U.C.C. § 9—504(3).

6. Defendant failed to produce any credible evidence to support his contention that the sale herein was unreasonable.

7. Accordingly, this court concludes that the FDIC is

entitled to a deficiency judgment against Creque in the instant case.

JUDGMENT

In accordance with the reasons set forth in the Memorandum Opinion of even date herewith, it is hereby

ORDERED and ADJUDGED that the defendant is indebted to plaintiff in the sum of $25,276.48, and it is

FURTHER ORDERED that plaintiff be and is hereby awarded attorney's fee and cost, and it is

FINALLY ORDERED that plaintiff submit an affidavit of attorney's fee and cost within fifteen (15) days of execution hereof.