2009 ME 117

**KEY EQUIPMENT FINANCE, INC.**

v.

**Benjamin P. HAWKINS.**

**No. BCD–09–119.**

Supreme Judicial Court of Maine.

Submitted On Briefs: Oct. 14, 2009.

Decided: Dec. 8, 2009.

Ralph A. Dyer, Esq., Law Offices of Ralph A. Dyer, P.A., Portland, ME, for Benjamin P. Hawkins.

Jacob A. Manheimer, Esq., Eric J. Wycoff, Esq., Pierce Atwood LLP, Portland, ME, for Key Equipment Finance, Inc.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

PER CURIAM.

[¶ 1] Benjamin P. Hawkins appeals from a judgment entered on the Business and Consumer Docket (Cumberland County, *Nivison, J.*) finding Hawkins liable to Key Equipment Finance, Inc. (KEF), for a deficiency judgment resulting from a bankruptcy sale of equipment. Because the sale occurred as part of a judicial proceeding and KEF successfully rebutted the presumption that the proceeds would have equaled the sum of the secured obligation, expenses, and attorney fees if KEF had given Hawkins authenticated notice, we affirm the judgment. Separately, we sanction Hawkins's counsel for his unprofessional conduct.

## I. BACKGROUND

[¶ 2] Hawkins began employment with Morse Brothers, Inc. (MBI), in 1991, and exercised an option to purchase fifty percent of its stock in 1995. At all relevant times, he was the treasurer/chief financial officer of MBI and sat on its board of directors.

[¶ 3] In 1995, Hawkins signed a Master Equipment Lease Agreement (Master Lease) with KEF on behalf of MBI. The Master Lease provided that all subsequent equipment schedules would incorporate its terms and that it would be interpreted according to New York law. Hawkins personally guaranteed MBI's obligations under the Master Lease and equipment schedules, waiving any defenses "arising on, out of, under, by virtue of, or in any way relating to the [Master] Lease, this Guaranty or the transactions contemplated" by the Master Lease or Hawkins's

guarantee. Starting in April 2002, MBI and KEF executed the five equipment schedules at issue, which covered ten tractors and fifteen trailers for varying multi-year periods and costs.

[¶ 4] In September 2005, Hawkins signed a Chapter 11 bankruptcy petition on behalf of MBI. During the bankruptcy proceedings, MBI's lawyers regularly conveyed developments to Hawkins. He ignored, did not read, or discarded without opening some amount of the materials MBI's lawyers sent to him.

[¶ 5] Despite these actions, Hawkins remained involved in the bankruptcy proceedings. He took part in negotiations to sell some of MBI's assets to JWA Holdings Corporation (JWA). On January 18, 2006, Hawkins signed, on behalf of MBI, an agreement to convey some of MBI's assets subject to the bankruptcy action to JWA. On February 16, 2006, he authorized changing MBI's name to MBI Liquidations. On an unknown date before March 28, Hawkins spoke with an employee of KEF to identify potential purchasers for the equipment at issue.

[¶ 6] After a series of negotiations between KEF and JWA, KEF agreed to sell all of the equipment subject to the Master Lease and five equipment schedules to JWA for $500,000. The United States Bankruptcy Court for the District of Maine authorized the sale on March 28, 2006. Before the draft Sale Order was filed with the court, MBI's lawyers reviewed and approved it, and sent a copy to Hawkins. The equipment was sold according to the Sale Order's terms on March 31, 2006.

[¶ 7] As of the sale date, MBI owed KEF $845,769.30 according to the payment terms of the equipment schedules. On September 28, 2006, KEF filed a complaint in the Superior Court, seeking to recover the deficiency of $345,769.30, costs, and attorney fees. The case was transferred

to the Business and Consumer Docket on October 11, 2007.

[¶ 8] In its May 13, 2008, decision on both parties' summary judgment motions, the court concluded that the five equipment schedules were security agreements, not leases. Despite the language in the personal guarantee waiving Hawkins's ability to raise any defenses, he could therefore assert two defenses that are unwaivable pursuant to N.Y. U.C.C. Law §§ 9–602(g),[1] 9–610(b),[2] 9–611(b), (c)(2)[3] (Consol.Supp.2009). The court denied his first defense that the sale was not commercially reasonable, because it found that the sale had occurred as part of a judicial proceeding, which made it per se commercially reasonable pursuant to N.Y. U.C.C. Law § 9–627(c)(*l*) (Consol.Supp.2009).[4]

[¶ 9] After a hearing on Hawkins's second defense that he did not have notice of the sale, the court issued a decision on September 22, 2008. Although the court found that Hawkins had constructive notice of the sale, it ruled that New York law requires authenticated, or written, notice pursuant to N.Y. U.C.C. Law §§ 9–102(a)(7), 9–611(b), (c)(2) (Consol.Supp.2009), which KEF had not provided to Hawkins. However, the court found that the lack of authenticated notice only created a presumption that, with proper notice, the sale proceeds would have been "equal to the sum of the secured obligation, expenses, and attorney's fees" pursuant to N.Y. U.C.C. Law § 9–626(a)(3)–(4) (Consol.Supp.2009).[5]

---

1. The relevant portion of N.Y. U.C.C. Law § 9–602 (Consol.Supp.2009) provides:

   Except as otherwise provided in Section 9–624, to the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections:
   . . . .
   (g) Sections 9–610(b), 9–611, 9–613, and 9–614, which deal with disposition of collateral.

2. N.Y. U.C.C. Law § 9–610(b) (Consol.Supp.2009) provides:

   Commercially reasonable disposition. Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

3. The pertinent portion of N.Y. U.C.C. Law § 9–61 l(Consol.Supp.2009) provides:

   (b) Notification of disposition required. Except as otherwise provided in subsection (d), a secured party that disposes of collateral under Section 9–610 shall send to the persons specified in subsection (c) a reasonable authenticated notification of disposition.

   (c) Persons to be notified. To comply with subsection (b), the secured party shall send an authenticated notification of disposition to:
   . . . .
   (2) any secondary obligor.

4. "A … disposition … is commercially reasonable if it has been approved: (1) in a judicial proceeding." N.Y. U.C.C. Law § 9–627(c)(1) (Consol.Supp.2009).

5. The relevant portion of N.Y. U.C.C. Law § 9–626 (Consol.Supp.2009) provides:

   (a) Applicable rules if amount of deficiency or surplus is in issue. In an action arising from a transaction, other than a consumer transaction, in which the amount of a deficiency or surplus is in issue, the following rules apply:
   . . . .
   (3) Except as other provided in Section 9–628, if a secured party fails to prove that the … disposition … was conducted in accordance with the provisions of this part relating to … disposition … the liability of a debtor of secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses and attorney's fees exceeds the greater of:
   (A) the proceeds of the … disposition …;
   or
   (B) the amount of proceeds that would have been realized had the non-complying

[¶ 10] In its February 12, 2009, decision, the court concluded that KEF had rebutted this presumption. The court reasoned that the sale had the approval of the bankruptcy court and trustee, who each would have sought to maximize the sale price and would only have agreed upon a fair value. Based on its prior findings, the court found that Hawkins had actual notice of the sale and that there would not have been a different result if KEF had given him authenticated notice, because he had a copy of the draft Sale Order with the sale price before it was approved, helped solicit buyers, and was involved in negotiating the sale. Moreover, the court noted that the sale price arose from good-faith negotiations between KEF and JWA. Therefore, the court entered judgment against Hawkins for $345,769.30 with interest and costs. This appeal followed.

## II. DISCUSSION

### A. The Sale Occurred in a Judicial Proceeding

[¶ 11] The issue of whether the sale of equipment was per se commercially reasonable because it occurred as part of a judicial proceeding was decided on summary judgment. We review the grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-prevailing party. *Picher v. Roman Catholic Bishop of Portland,* 2009 ME 67, ¶ 7, 974 A.2d 286, 289. Summary judgment should be affirmed "if the record

reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Id.* (quotation marks omitted). "An issue is genuine if there is sufficient evidence supporting the claimed factual dispute to require a choice between the differing versions; an issue is material if it could potentially affect the outcome of the matter." *Cookson v. Brewer Sch. Dep't* 2009 ME 57, ¶ 11, 974 A.2d 276, 280 (quotation marks omitted).

[¶ 12] What constitutes a judicial proceeding for the purposes of section 9–627(c)(*l*) has not been analyzed by the New York courts. Therefore, we will rely on interpretations of its substantially similar predecessor statute, N.Y. U.C.C. Law § 9–507(2) (Consol.2000) (amended 2001).[6] Pursuant to section 9–507(2), a disposition was approved in a judicial proceeding if all of the sale terms were completely set and passed through a "judicial filter," and all parties had an opportunity to be heard. *In re Zsa Zsa Ltd.,* 352 F.Supp. 665, 672 (S.D.N.Y.1972); *see Fed Deposit Ins. Corp. v. Forte,* 144 A.D.2d 627, 535 N.Y.S.2d 75, 76 (1988).

[¶ 13] When discussing the opportunity to participate in a disposition, the courts refer to the opportunities of interests or parties. *In re Zsa Zsa Ltd.,* 352 F.Supp. at 672; *Bryant v. Am. Nat'l Bank & Trust Co. of Chicago,* 407 F.Supp. 360, 364–65 (N.D.Ill.1976) (discussing *In re Zsa Zsa Ltd.*). Here, Hawkins was involved in

secured party proceeded in accordance with the provisions of this part relating to ... disposition....
(4) For purposes of paragraph (3)(B), the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney's fees unless the secured party proves that the amount is less than that sum.

6. The relevant portion of N.Y. U.C.C. Law § 507(2) (Consol.2000) (amended 2001) provides:

A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable.

the bankruptcy proceedings, including the equipment sale, as a corporate officer, not as an individual party, and his potential liability stems from his personal guarantee. Therefore, Hawkins argues, he did not have an opportunity to participate in the disposition of the equipment.[7]

[¶ 14] However, as a stockholder, Hawkins qualified as an equity security holder, and had the legal right to participate in an individual capacity. 11 U.S.C.S. § 101(16)-(17) (LexisNexis 2007); 11 U.S.C.S. § 1109(b) (LexisNexis 2000). Additionally, through his involvement as a corporate officer, Hawkins was familiar with the progress of the· bankruptcy proceedings. Therefore, he had an opportunity to participate as an individual in the disposition of the equipment.

██ [¶ 15] We also conclude that the Sale Order was satisfactorily complete. The Sale Order: (1) listed the number and types of equipment each schedule covered; (2) stated in what forms the price of $500,000 could be tendered and that it must be paid by April 3, 2006; (3) described the release of MBI and its subsidiaries from any future claims; and (4) stated that KEF was transferring its entire interest in the equipment to JWA. Thus, it was sufficiently complete so as to satisfy the requirement that all sale terms be set and pass through a "judicial filter." *In re Zsa Zsa Ltd.*, 352 F.Supp. at 672; *see Forte*, 535 N.Y.S.2d at 76.

[¶ 16] Therefore, there was no disputed issue of material fact about whether the bankruptcy court's Sale Order was approved as part of a judicial proceeding. Consequently, the sale was commercially reasonable per se pursuant to section 9–627(c)(*l* ), and KEF was entitled to judgment as a matter of law on Hawkins's defense of commercial reasonableness.[8]

**B. KEF Rebutted the Section 9–626(a)(3)–(4) Presumption**

██ [¶ 17] The issue of whether KEF rebutted the presumption that, if it had given Hawkins authenticated notice of the sale, the sale would have generated an amount equal to the secured obligation, expenses, and attorney fees is a question of fact. *See Toomey v. City of Portland,* 391 A.2d 325, 331–32 & n. 6 (Me.1978). We review factual findings "for clear error and will affirm the court's findings if there is competent evidence in the record to support them, even if the evidence might support alternative findings of fact.... All factual findings are accorded substantial deference and overturned only if clearly erroneous." *York Hosp. v. Dep't of Health & Human Servs.*, 2008 ME 165, ¶ 16, 959 A.2d 67, 71 (quotation marks omitted).

[¶ 18] According to New York law, KEF was required to send Hawkins authenticated notice of the equipment sale. N.Y. U.C.C. Law §§ 9–102(a)(7), 9–611(b), (c)(2). However, KEF's failure to comply with this requirement only created a pre-

---

7. Hawkins also argues that the approval of the Sale Order by the bankruptcy court was not a judicial proceeding because the approval was a ministerial act, there was no hearing, and he did not receive notice of the disposition. In light of our conclusion below that Hawkins did have an opportunity to participate in the disposition of the equipment, we find these arguments to be without merit and do not discuss them further.

8. Because the rule of per se commercial reasonableness applies, we need not analyze

whether the equipment sale was commercially reasonable on its own terms. However, the record suggests that it was. KEF and JWA completed several rounds of negotiations before settling on the $500,000 price, $500,000 was close to the reasonable orderly liquidation value of $552,000 found by an appraisal a month before the sale, and KEF would likely have incurred additional expenses if it had repossessed the equipment and sold it at a public auction. Hawkins has presented no credible evidence to suggest the sale terms were not commercially reasonable.

sumption that, if the proper notice had been given, the sale proceeds would have equaled the sum of the secured obligation, expenses, and attorney fees.[9]  N.Y. U.C.C. Law § 9–626(a)(3)–(4);  *Coxall v. Clover Commercial Corp.*, 4 Misc.3d 654, 781 N.Y.S.2d 567, 576 (Civ.Ct.2004) (discussing the adoption of the rebuttable presumption rule in New York for non-consumer transactions).

[¶ 19]  Under New York law, the effect of a presumption is "that the trier of fact must find the existence of the fact presumed unless and until evidence is introduced which would support a finding of its nonexistence."  N.Y. U.C.C. Law § 1–201(31) (Consol.1999).  To rebut the presumption, KEF need only have provided "some evidence" that the sale proceeds would have been less than the sum of the secured obligation, expenses, and attorney fees even if authenticated notice had been given.  *See Freeman Check Cashing, Inc. v. State*, 97 Misc.2d 819, 412 N.Y.S.2d 963, 964–65 (Ct.Cl.1979).

■ [¶ 20]  KEF met its burden in rebutting the presumption.  It showed that Hawkins was involved in selling or transferring some of MBI's assets to JWA, he identified potential buyers to KEF, he knew about the equipment sale before it was finalized, and he did not act to challenge its terms.  KEF also demonstrated that the equipment had been appraised as having an orderly liquidation value of $552,000 a month before the sale and that the final price of $500,000 was set after several rounds of negotiations.  Therefore, KEF produced some evidence that it was more probable than not that the equip-

ment would still have sold for $500,000 if Hawkins had been given authenticated notice.  Hawkins has presented no credible evidence that these findings were clearly erroneous.  Because KEF rebutted the section 9–626(a)(3)–(4) presumption, the trial court did not err in finding that KEF was entitled to a deficiency judgment of $345,769.30 against Hawkins.  Accordingly, we affirm the judgment of the Business Court in all respects.

C.  Sanctions

■ [¶ 21]  Separate from the merits of the appeal, we must determine whether the conduct of Hawkins's counsel in this appeal warrants sanctions.  Appeals are generally founded upon claims of error committed by the tribunal below.  Consequently, counsel must identify the precise nature of the claimed error and support such claims with citations to the record.  Effective representation involves zealous advocacy, and neither the trial court nor the appellate court take umbrage at such assertions of error.

[¶ 22]  Counsel for Hawkins in this matter, however, affixed his name to an escalating tirade of unsupported accusations and aspersions that fundamentally call into question the trial court's independence and competence.  Examples, culled from Hawkins's appellate briefs, include the following:

1. "The Procedures for Allowing A Secured Creditor Recovery of a Deficiency Following a Commercially Unreasonable Sale of Collateral Were Twisted to Bring About The Conclusion Sought By The Court."  (Appellant's Br. Table of Contents.)

---

9.  Hawkins contends that, since the disposition was defective both because it was commercially unreasonable and because KEF did not provide him with authenticated notice, to rebut the presumption, KEF must show that the equipment was worth only $500,000 or base the deficiency on the highest possible price that "a reasonable businessman-creditor" could get with authenticated notice.  However, Hawkins has presented no persuasive or binding authority to support this argument, and we have already concluded that the equipment sale was per se commercially reasonable.

2. "Not only does the Court seem to be perturbed that the correct point of law was raised and argued in a timely manner, but also the accusation that point had not been made previously is incorrect." (Appellant's Br. 8 n. 5.)

3. "The Superior Court's finding of no credible evidence to support Hawkins' contention can only be described as outright bias, extreme naivete [*sic*] or intentional disregard in order to simplify the instant court action. . . . There is ample evide3nce [sic] within the September 22, 2008 and February 12, 2009 Decisions to believe that the Superior Court followed its own rule of substance over form, and he intentionally ignored the rule of law." (Appellant's Br. 29 n. 9.)

4. "Instead, the lower court again went off the rails and compounded its error by erroneously concluding that the receipt of notice of sale by the secondary obligors was a separate requirement independent from and paralleling the requirement for a commercially reasonable sale." (Appellant's Br. 31.)

5. "Judge Nivison's failure to recognize this point is so extreme as to raise suspicion of unacceptable bias or a desire to be rid of the case." (Appellant's Br. 40.)

6. "The Superior Court has fabricated a set of facts to achieve a predisposed end. s [*sic*] comprised of far-fetched inferences drawn from the facts in evidence. The decision is almost completely a matter of speculation and fiction. A court of law is not the place to write fictional scripts[.]" (Appellant's Br. 43.)

7. "Hawkins submits that the *Superior Court* must know that it completely mis-handled [*sic*] this case with contradictory, erroneous decisions created by digging the hole deeper in the effort to resolve threshold errors." (Appellant's Br. 43.)

8. "By going back to the initial decision made on May 13, 2008, the Superior Court apparently believed that the matter could be brought to quick conclusion and the debris would br [*sic*] left to the Law Court to gather and re-assemble [sic]." (Appellant's Br. 44.)%

9. "The actions of the Superior Court are marked by bias and incompetence. This kind of judicial anarchy is not consistent with the notion of substantive due process." (Appellant's Br. 44.)

10. "Even if the use of the sales price in the original sales price could be relied upon in any circumstances to rebut the § 9–626(a)(4) presumption, the finding of commercial reasonableness by the Superior Court in this case was incompetent and contrary to the standards of commercial reasonableness found at § 9–627(b)." (Appellant's Reply Br. 17 n. 3.)

[¶ 23] Vigorous advocacy cannot be an excuse for unfounded accusations and childish vitriol. Counsel, the court, and the profession deserve better.

[¶ 24] The record here is devoid of any feasible basis for Mr. Dyer's acerbic accusations of bias and incompetence against the trial court. His statements cannot be excused in the name of zealous representation; they are utterly unfounded and clearly call into issue the qualifications and integrity of a judge. M. Bar R. 3.2(c)(1).[10]

10. The pertinent portion of M. Bar R. 3.2(c)(1), which was effective at the time of the conduct at issue, provides: "A lawyer shall not make a false statement of fact, with

A monetary sanction of $2500 is personally imposed upon Mr. Dyer pursuant to M.R.App. P. 13(f) for his flagrant transgression.

The entry is:

Judgment affirmed. Ralph A. Dyer, Esq., is ordered to pay a sanction of $2500 to the Clerk of the Law Court.

knowledge that it is false or with reckless disregard as to its truth or falsity, concerning the qualifications or integrity of a judge...."

This portion of M. Bar R. 3.2(c)(1) is now located at M.R. Prof. Conduct 8.2(a).