FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Franklin National Bank, Respondent, v HERALD SQUARE FABRICS CORP. et al., Defendants, and LEONARD MACHINERY CORP. et al., Appellants.

Second Department, June 15, 1981

**APPEARANCES OF COUNSEL**

*Baer Marks & Upham (George H. Colin* of counsel), for Leonard Machinery Corp., appellant.

*Otterbourg, Steindler, Houston & Rosen, P. C. (Peter H. Stolzar, Bernard Beitel* and *Anthony M. Piccione* of counsel), for Concord Fabrics, Inc., appellant.

*Weiss, Tucker & Topper (Jack Weiss* and *Robert Topper* of counsel), for respondent.

### OPINION OF THE COURT

MANGANO, J.

Three primary issues are raised on this appeal. The first concerns the formal requisites for the enforceability of a contract for the sale of chattel paper. The second involves the authority of a court, on a motion for summary judgment, to interpret a printed contract when there appears on its face a blank space. The third requires the statutory construction of the term "commercial reasonableness", in the context of section 9-504 of the Uniform Commercial Code, and specifically poses the following question: when there has been a postdefault disposition of collateral by a secured creditor, to what extent or degree will a discrepancy between the collateral's original sale price and its disposal price be sufficient to raise an issue of fact for trial, and thus defeat a motion for summary judgment?

On December 18, 1970 Leonard Machinery Corporation (Leonard) and Franklin National Bank (the bank) en-

tered into a dealer agreement covering the periodic sale by Leonard to the bank of "conditional sales contracts, leases, other title retention documents, lien instruments (all hereinafter referred to as 'Instruments') and promissory notes (hereinafter referred to as 'Notes'), arising from the sale of goods and services or leasing of equipment and the extension of credit." The agreement, apparently drawn up on a preprinted form prepared by the bank, provided that the bank would not be obligated to accept any note or instrument offered for sale, and that: "Any Note and Instrument having a face value in excess of $ [would] be deemed to be and called an 'Excess Transaction'. All Excess Transactions [would] be excluded from the terms of paragraph 7(b). [Leonard's] *liability on any purchase by* [the bank] *of an Excess Transaction [would] be subject to such agreement as may be made in connection therewith.*" (Emphasis added.) Of particular note is the fact that the blank space in the above-quoted provision was intended for the entry of a money amount, over which any transaction would have been termed an excess transaction. This blank space was never completed. Also of note is the fact that, if the blank space had been completed, and the term excess transaction defined, the only effect would have been the exclusion of all such transactions from the provisions of subdivision (b) of paragraph 7. As will be explained, subdivision (b) of paragraph 7 simply placed a limitation on Leonard's liability under the agreement in any given year.

Paragraph 2 of the dealer agreement established that Leonard's liability on any note or instrument purchased by the bank would be determined solely by the agreement. It specifically read in relevant part: "All Notes and Instruments that [the bank] may purchase hereunder shall be respectively *duly endorsed and assigned by* [Leonard] *to* [the bank] *without recourse, but liability thereunder shall be determined by this agreement.*" (Emphasis added.)

Paragraph 4 read in relevant part: "For each Note and Instrument that [the bank] purchase[s] from [Leonard], [Leonard] shall accept a sum equal to the net amount thereof less finance and other charges."

Subdivision (a) of paragraph 7 specified the extent of Leonard's liability if the primary promissor, obligor, or

debtor on any note or instrument should default in any of his obligations thereunder, or if a petition should be filed by or against him under any provisions of the Bankruptcy Act, or if any other event as detailed in subdivision (a) of paragraph 7 should occur to impair the bank's security or increase the credit risk involved. In such event, Leonard promised, at the bank's option, and without the requirement of any formal notice, to forthwith "repurchase all of the outstanding Notes and Instruments of the said [promissor, obligor, or debtor] purchased by [the bank] whether in default or not, and [to] pay [the bank] therefor the unpaid amount owing on said Notes and Instruments and any disbursements and legal fees incurred by [the bank] in connection therewith".

Subdivision (b) of paragraph 7 was a liability limitation clause to the effect that:

"The liability of [Leonard] to repurchase Notes and Instruments under this numbered paragraph only shall be limited as follows:

"(1) At any time during any calendar year [repurchase shall be limited to] 25% of the total balances due on all Notes and Instruments purchased by [the bank] from the date of this Agreement".

Finally, in paragraph 8 of the agreement it was provided that if Leonard should fail to perform any of the terms or conditions thereof, it would be required to "repurchase all of the outstanding Notes or Instruments purchased by [the bank], whether in default or not, and pay [the bank] the unpaid amount owing on said Notes or Instruments and any disbursements and legal fees incurred by [the bank] in connection therewith". In paragraph 9 it was agreed that Leonard's obligation thereunder would "not be affected by any provision of the terms of any Notes or Instruments". In paragraph 10 the agreement was deemed to have superseded all existing agreements between the parties "and all purchases of Notes or Instruments from the date of this Agreement [were] deemed to have been made under the terms [t]hereof." And in paragraph 11 there was a clause excluding modification except by a signed writing, to wit: "No provision of this Agreement shall be modified or altered

except in writing duly signed by [the bank's] duly authorized officers."

In March, 1973 Leonard sold six knitting machines to Herald Square Fabrics, Inc. (Herald Square). The sale price was $85,200. In payment thereof, Leonard took a down payment of 10% ($8,520), leaving an unpaid balance of $76,680. This unpaid balance, plus other charges, resulted in a time balance of $88,192, for which Leonard took back a promissory note. The note was executed by Herald Square, as promissor, for the benefit of Leonard, as promisee, and indorsed "with recourse" by two individuals, Herman and Fred Zucker,[1] and "without recourse" by Leonard. It was then secured by, and delivered in connection with, a security agreement, dated March 29, 1973. This agreement between Leonard, as secured creditor, and Herald Square, as debtor, was, in turn, assigned, with the promissory note, by Leonard to Franklin National Bank for value received.

On April 3, 1973 a financing statement was filed showing Leonard as the secured creditor of Herald Square, and the bank as Leonard's assignee. The financing statement also showed the six knitting machines purchased by Herald Square as the subject collateral.

It appears that within the next six months, Herald Square defaulted in its payments on the note and security agreement. Consequently, on or about September 19, 1973, Franklin National Bank served Herald Square with a default notice, followed soon after by several other such notices. Finally, on or about November 16, 1973, the bank made a formal demand on Herald Square for the unpaid balance on the note and agreement, then amounting to $78,-392.88 (plus accrued late charges of $489.96). At almost the same time, Herald Square apparently filed a petition for an arrangement in bankruptcy.

On February 4, 1974 the bank made a formal demand on Leonard, pursuant to the dealer agreement of December 18, 1970, for immediate payment of its "obligation of 25% of the balances due from Herald Square". The bank claimed a

---

1. The precise relationship between these two individuals and Herald Square is not clear from the record.

balance due of $79,127.82, and thus demanded $19,781.96, with attorney's fees of 15% of said sum.

Thereafter, Franklin made attempts[2] to repossess the six knitting machines. These attempts were subsequently held in abeyance, pending the efforts of Herald Square's attorney to arrange for a liquidation of his client's property. These efforts extended from at least April to December of 1974, and seemingly generated two offers to purchase all of Herald Square's equipment.[3] The first alleged offer was for $250,000 and the second for $200,000. Nevertheless, Herald Square's attempts at liquidation ultimately proved unsuccessful.

Consequently, the plaintiff, Federal Deposit Insurance Corporation (FDIC), as receiver of Franklin National Bank[4], obtained an order from the Federal District Court for the Southern District of New York, dated February 24, 1975, authorizing Herald Square's trustee in bankruptcy to surrender the six knitting machines to FDIC's agent. In said order, it was recited that "it appear[ed] to the satisfaction of the Court that the realizable value of the [six knitting machines] * * * [was] less than the amount due and owing to [FDIC]".

Subsequent to the surrender order, FDIC arranged a public sale of the collateral. Although the record is confusing on this point, it appears that a notice announcing the date of sale as June 13, 1975 was received by Leonard on June 4, 1975. Notice was received on June 5, 1975 by Concord Fabrics, Inc. (Concord), which, by written agreement dated December 18, 1970, had become guarantor of all of Leonard's liability.[5] No other notices were served.

---

2. These attempts included an action in Federal District Court for the Southern District of New York to have the knitting machines turned over to the bank by Herald Square's trustee in bankruptcy.

3. It should be noted that the record does not reflect whether the six knitting machines sold by Leonard constituted all of Herald Square's equipment, or, if not, what proportion of the whole they represented.

4. On October 8, 1974, the Comptroller of the Currency determined that Franklin National Bank was insolvent and unable to meet the demands of its depositors and to pay its just and legal debts. The Comptroller therefore appointed FDIC receiver of the bank.

5. It should be noted that defendant Herman Zucker Textiles Co., Inc., had, by written agreement dated March 26, 1973, become guarantor of all Herald Square's liability.

As conceded by all the parties appearing on this appeal, the six knitting machines were sold for $8,393.14.

Thereafter, FDIC commenced the instant action. In its complaint and amended complaint, it alleged that the net proceeds of the public sale were insufficient to satisfy the indebtedness and costs to FDIC resulting from the default on the promissory note and security agreement. FDIC, therefore, claimed a deficiency of $73,027.08, and sought recovery from the various defendants on the following grounds: (1) as and against Leonard, upon its contractual obligations under the dealer agreement; (2) as and against Herald Square, upon its obligations as promissor on the promissory note; (3) as against Fred and Herman Zucker, as indorsers "with recourse" on the note; (4) as and against Concord, as guarantor of all of Leonard's debts; and (5) as and against Herman Zucker Textiles Co., Inc., as guarantor of all of Herald Square's debts.

By motion returnable April 23, 1979, plaintiff FDIC moved, *inter alia*, for summary judgment against all defendants and thereafter, Leonard and Concord separately cross-moved for summary judgment dismissing the complaint as to each of them.

By order dated November 14, 1979, and resettled on February 4, 1980, Special Term, *inter alia*, denied Leonard and Concord's cross motions for summary judgment; ordered the instant action against Herald Square, Herman Zucker Textiles Co., Inc., and Frederick Zucker stayed by virtue of pending bankruptcy proceedings, and directed the entry of a money judgment in favor of FDIC against Leonard, Concord and Herman Zucker. On January 11, 1980, motions by defendants Leonard and Concord for reargument were denied, and, on January 17, 1980, judgment was entered upon the order of November 14, 1980, as subsequently resettled.

In its memorandum decision of October 15, 1979, upon which the order granting summary judgment, as resettled, and the judgment were based, Special Term determined that Herald Square, Frederick Zucker, and Herman Zucker Textiles Co., Inc., were either discharged in bankruptcy or had bankruptcy petitions pending which acted to abate this action against them.

Special Term then turned to the defendants Leonard and Concord. It found that "Concord, as the guarantor of all present and future obligations of Leonard, stands in the shoes of Leonard and if the action succeeds or fails against Leonard, it will likewise succeed or fail against Concord." For this reason, plaintiff's motion for summary judgment and the cross motions for summary judgment by Leonard and Concord were treated together.

Initially, Special Term pointed out that FDIC "[was] not suing Leonard and, therefore, Concord, upon the [promissory] note. Instead, it base[d] its action upon the Dealer Agreement between Franklin [National Bank] and Leonard. The Agreement provide[d] for the purchase by Franklin of notes owned by Leonard and set * * * certain terms, conditions, and rights pertaining thereto." Quoting paragraph 2 of the agreement, which required Leonard to indorse and assign notes and instruments to Franklin "without recourse", Special Term found that the promissory note in this case was so indorsed and thus in complete accord with the agreement.

Furthermore, Special Term found that certain correspondence between Leonard and Franklin had in no way modified the dealer agreement. In an exchange of letters soon after the assignment of the note and security agreement, Franklin had not commented on a statement by Leonard "that the assignment by Leonard Machinery to the bank was on a non-recourse basis." It was asserted by Leonard and Concord that this correspondence had, in effect, modified the dealer agreement. The letters were offered as evidence of an understanding by the parties that the "without recourse" indorsement on the promissory note had expressed their intent that Leonard would have no further obligations to the bank concerning the financing of the sale of the six knitting machines, notwithstanding the dealer agreement. A similar argument had been made in connection with a bank memorandum, which had referred to this transaction as having been on a nonrecourse basis. Special Term rejected these arguments and pointed out that the language in these documents was completely consistent with, and did not alter, the terms of the dealer agreement.

Next, Special Term rejected the contention of Leonard and Concord that the dealer agreement was unenforceable as an incomplete instrument, because of the blank space in the opening paragraph pertaining to excess transactions. It concluded that the "blank [did] not make for an incomplete instrument but * * * evidence[d] an intent on the part of the parties for there to be no 'Excess Transactions' in the course of dealings between the parties. To accomplish such a result, the space would, of necessity, be left blank."

Finally, Special Term found that the collateral was not held for an unreasonable time before sale, nor was it sold in a commercially unreasonable manner. The court found this to be especially true since both Leonard and Concord were given notice of the sale, were presumably aware of the value of the collateral, and had ample opportunity to protect their rights. Special Term therefore concluded that by simply pointing out the eventual sale price of the collateral, without any further substantive evidence, defendants Leonard and Concord had not raised an issue of fact with respect to the commercial reasonableness of the sale.[6]

 We agree with Special Term that the dealer agreement of December 18, 1970 was a binding and enforceable contract, and that Leonard's assignment of the promissory note and security agreement was subject to its provisions. We also agree that the blank space pertaining to excess transactions reflected the parties' intent at the time the dealer agreement was concluded not to contract concerning that term. We do not agree, however, that no issue of fact existed on the question of the commercial reasonableness of the public sale of the collateral.

I

With regard to the enforceability and meaning of the dealer agreement and its specific applicability to Franklin's financing of Leonard's sale of the knitting machines to Herald Square, three questions are presented. First, did the blank space in the provision pertaining to the definition of an excess transaction render the dealer agreement unen-

6. Special Term also decided that Herman Zucker, as an indorser with recourse, was liable on the promissory note.

forceable? Second, did Special Term properly decide that the dealer agreement was capable of interpretation by the court on a motion for summary judgment, and, if so, was its interpretation correct? And finally, had the dealer agreement been in any way modified by the parties so as to make it inapplicable to the sale/purchase transaction here in question?

## A

In disclaiming all liability for the recovery sought by FDIC, Leonard and Concord raised two main points at Special Term, viz., (1) that, when the promissory note was transferred to the bank, Leonard indorsed it "without recourse", thus releasing itself from all future liability thereon, and (2) that, since the dealer agreement containing the blank space did not specify what an excess transaction was, it did not contain all of the material elements of the contract, and, to that extent, was unenforceable.

Special Term quite correctly observed that plaintiff was not suing Leonard on the note, but on the agreement. Therefore, the fact that the note was indorsed "without recourse" was irrelevant. Furthermore, the dealer agreement specifically required that all notes and instruments purchased by the bank be indorsed "without recourse", and that liability be governed solely by the agreement. This was obviously done to allow for a more flexible arrangement with regard to Leonard's total liability, and the annual limitation thereof, which could not have been achieved by merely indorsing notes and instruments "with recourse".

The real issue, then, is whether the dealer agreement containing the blank space referring to excess transactions was enforceable.

Essentially, the dealer agreement of December 18, 1970 was a contract for the sale of chattel paper. That is, the promissory note and the security agreement, which were assigned for value, constituted a writing or writings evidencing both a monetary obligation and a security interest in or a lease of specific goods (Uniform Commercial Code, § 9-105, subd [1], par [b]). "When a transaction is evidenced both by such a security agreement or a lease and by

an instrument or a series of instruments, the group of writings taken together constitutes chattel paper" (Uniform Commercial Code, § 9-105, subd [1], par [b]).[7]

Under section 9-102 (subd [1], par [b]) of the Uniform Commercial Code, the sale of chattel paper is deemed a security transaction subject to article 9. It is not, strictly speaking, however, a pure security transaction, since the chattel paper being transferred is not collateral to secure a debt owed by the transferor to the transferee. It could be (see Uniform Commercial Code, § 9-102, subd [1], par [a]), and in that situation would be collateral for a pure security transaction. In the sale of chattel paper, however, the paper is simply the personal property sold for value received. As noted in the commentaries to section 9-102: "An assignment of accounts or chattel paper as security for an obligation is covered by subsection (1) (a). Commercial financing on the basis of accounts and chattel paper is often so conducted that the distinction between a security transfer and a sale is blurred, and a sale of such property is therefore covered by subsection (1) (b) whether intended for security or not" (3 Uniform Laws Ann, Uniform Commercial Code, 1980 Pamphlet, § 9-102, 1972 Official Comment 2, pp 8-9).

Although only deemed a security transaction, the sale of chattel paper is undeniably an article 9 transaction. The enforceability of a contract for the sale of chattel paper, therefore, would seemingly be covered by article 9 of the Statute of Frauds (Uniform Commercial Code, § 9-203). And yet, the express language of section 9-203 refers only to what may be called a pure security transaction. It is concerned with the formal prerequisites to the attachment of a security interest in identified collateral, so as to render such interest enforceable by the secured creditor (Uniform Commercial Code, § 9-203, subds [1], [2]). It does not set forth

---

7. An "instrument" means a negotiable instrument (Uniform Commercial Code, § 9-105, subd [1], par [i]), e.g., a promissory note (Uniform Commercial Code, § 3-104) and a "security agreement" means an agreement which creates or provides for a security interest (Uniform Commercial Code, § 9-105, subd [1], par [l]). A security interest means an interest in personal property or fixtures which secures payment or performance of an obligation and includes any interest of a buyer of chattel paper which is subject to article 9 of the code (Uniform Commercial Code, § 1-201, subd [3]).

the formal prerequisites, under a Statute of Frauds analysis, for the enforceability of a contract for the sale of chattel paper.

We turn, therefore, to the general provisions of the code and, specifically, section 1-206, the "Statute of Frauds for Kinds of Personal Property Not Otherwise Covered". In subdivision (2) of section 1-206, it states that this section does not apply to security agreements, and refers the reader to section 9-203, the particular Statute of Frauds for such agreements. Initially, then, it would appear that a contract for the sale of chattel paper, being an article 9 security transaction, is not covered by section 1-206. However, we have seen that section 9-203, by its terms, does not apply to such sales. Thus, the exclusion of security agreements from coverage by section 1-206 would not seem to include contracts for the sale of chattel paper, which are not otherwise covered in the code for Statute of Frauds purposes. Therefore, we construe section 1-206 of the Uniform Commercial Code as applying to such contracts.

Subdivision (1) of that section reads: "Except in the cases described in subsection (2) of this section a contract for the sale of personal property is not enforceable by way of action or defense beyond five thousand dollars in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent." Assuming that the dollar amount requirement is fulfilled, all that is necessary for an enforceable contract under subdivision (1) of section 1-206 is:

 (1) a writing,
 (2) indicating a contract of sale between the parties,
 (3) at a specified or defined price,
 (4) as to reasonably identified subject matter, and
 (5) signed by the party against whom enforcement is sought.

In the case at bar, enforcement of the dealer agreement was sought for a sale of chattel paper well in excess of $5,000. There was certainly a writing, and it clearly set

forth an agreement concerning the sale of identified subject matter, i.e., notes and instruments. The parties were indicated, the price specified, and the agreement was signed by Leonard, against whom enforcement was sought. Under section 1-206, therefore, the dealer agreement, although it contained the blank space pertaining to excess transactions, was nevertheless an enforceable contract.

## B

In considering whether Special Term, on the motion for summary judgment, properly interpreted the dealer agreement, it must be initially observed that, "[w]here the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law, and * * * no trial is necessary to determine the legal effect of the contract [citations omitted]". *(General Phoenix Corp. v Cabot,* 300 NY 87, 92; see *Hartford Acc. & Ind. Co. v Wesolowski,* 33 NY2d 169, 172; *West, Weir & Bartel v Carter Paint Co.,* 25 NY2d 535, 540; *Stone v Goodson,* 8 NY2d 8, 13.) "Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact." *(Bethlehem Steel Co. v Turner Constr. Co.,* 2 NY2d 456, 460.)

On the motion and cross motions for summary judgment in the case at bar, Special Term read the dealer agreement as evidencing an intent by the parties to leave the blank space in the excess transaction provision incomplete, rendering that provision inoperative. It reached this conclusion by reference to the contract language alone, without looking beyond the four corners of the document. This was necessary, and authorized, because Special Term was not presented with any evidence that the parties had either unintentionally left the blank space incomplete, or had intended to complete the space in any particular way. It was not even suggested at Special Term that the language of the agreement exposed it to differing interpretations or that there was any specific understanding between the parties which, by reason of the blank space, the agreement had failed to memorialize. Defendants Leonard and Concord, in

cross-moving for summary judgment, had simply contended, in effect, that with the blank space, the dealer agreement was per se incomplete, implying that, as a matter of law, it was an insufficient memorandum of the parties' agreement.

A blank space in a written contract does not, as a matter of law, render the contract an incomplete or insufficient memorandum of the parties' whole agreement. (See *N.E.D. Holding Co. v McKinley*, 246 NY 40, 45.) If a blank space were not filled, "it may be rejected as surplusage if the parties so intended *(Grady* v. *Fazzolari*, 134 App. Div. 589; cf. Williston, Contracts, §§ 1141, 1909)." *(N.E.D. Holding Co. v McKinley, supra,* p 44.)

Special Term, therefore, properly denied defendants-appellants' cross motions for summary judgment.

The question still remains, however, whether, on plaintiff's motion for summary judgment, Special Term was authorized to interpret the dealer agreement containing the blank space as evidencing an intent by the parties that the excess transaction provision be rendered inoperative by the blank space and rejected as surplusage. In answering this question, we refer to the following guidelines of the Court of Appeals: "To defeat summary judgment the opponent must present evidentiary facts sufficient to raise a triable issue of fact, and averments merely stating conclusions, of fact or of law, are insufficient (e.g., *Ehrlich* v. *American Moninger Greenhouse*, 26 NY2d 255, 259; *P.D.J. Corp.* v. *Bansh Props.*, 29 AD2d 927, affd. 23 NY2d 971; 4 Weinstein-Korn-Miller, N.Y. Civ. Prac., ¶ 3212.05c, esp. p. 32-142.36; 6 Carmody-Wait, N.Y. Prac. [2d ed.], § 39.29). Thus, it is not enough for the opponent to show that an agreement is ambiguous permitting the introduction of parol evidence. The opponent must also disclose in evidentiary form the particular parol evidence, if any, on which it relies. *(Ehrlich* v. *American Moninger Greenhouse*, 26 NY2d 255, *supra; Hertz Commercial Leasing Corp.* v. *Transportation Credit Clearing House*, 64 Misc 2d 910 [App. Term], revg. 59 Misc 2d 226.) Otherwise, there are only documents to interpret, and the court may resolve ambiguities appearing in the documents on a motion for sum-

mary judgment (see *Rentways, Inc.* v. *O'Neil Milk & Cream Co.*, 308 N. Y. 342, 349; *Hertz Commercial Leasing Corp.* v. *Transportation Credit Clearing House, supra;* 4 Williston, Contracts [3d ed.], § 601; 10 N.Y. Jur., Contracts, § 190)." *(Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285, 290-291; see *Hartford Acc. & Ind. Co. v Wesolowski*, 33 NY2d 169, 172, *supra.)*

Therefore, since in the instant matter no evidence was offered to show that, at the time the dealer agreement was concluded, there existed any other agreement between the parties relating to the same subject matter, Special Term was bound to determine the intent of the parties solely in accordance with the contractual language of the dealer agreement. In doing so, the court read the agreement as a whole (see *Atwater & Co. v Panama R.R. Co.*, 246 NY 519; *Fleischman v Furgueson*, 223 NY 235) and gave it a fair and reasonable interpretation. (See *Aron v Gillman*, 309 NY 157.) It properly concluded that the blank space in the obviously collateral provision concerning excess transactions was intended to render that provision inoperative and thus to indicate that it was surplusage.

### C

On the issue of the dealer agreement's applicability to the sale/purchase transaction here in question, defendant Leonard produced documentary evidence, dated approximately two and one-half years after execution of the dealer agreement. At best, these documents could have been construed as having modified the dealer agreement so as to exclude the instant transaction from its terms. However, their language merely reiterated the very terms of the dealer agreement, i.e., that the transfer of notes and instruments would be on a nonrecourse basis. Nothing in these documents indicated that any of the provisions of the dealer agreement were in any way altered or intended to be altered. In fact, the dealer agreement was not even referred to in these documents, let alone modified. Special Term, therefore, correctly concluded that by the terms of the agreement, which were never expressly modified or altered by any writing signed by an authorized officer of Franklin National Bank, the instant sale/purchase transaction was made in accordance therewith.

## II

Finally, we turn to the question of the commercial reasonableness of plaintiff's disposition of the repossessed collateral by public sale.

Initially, it must be noted that there are no issues raised on this appeal concerning the adequacy of the notice of sale or as to any conduct evidencing self-dealing by the secured party FDIC. Furthermore, we do not believe that plaintiff, or its predecessor in interest, unreasonably delayed in repossessing or selling the collateral. Commercially responsible steps were taken to arrange for the collateral's profitable disposition, including protracted negotiations concerning a liquidation sale by the primary debtor. When these negotiations failed, plaintiff did not hesitate to petition the Bankruptcy Court for release of the collateral by the primary debtor's trustee in bankruptcy. After release, a public sale was arranged and took place within three and one-half months. FDIC, therefore, cannot be charged with any delay in moving to protect the value of the collateral.

The only issue we must consider is whether, and to what extent, proof of a discrepancy between the original sale price of collateral and a lower sale price upon its postdefault disposition will be enough to defeat a secured creditor's motion for summary judgment on the issue of damages.

In exercising its right to sell the six knitting machines after Herald Square's default on the note and security agreement (Uniform Commercial Code, § 9-504), FDIC's primary obligation was to dispose of the collateral in a commercially reasonable manner (Uniform Commercial Code, § 9-504, subd [1]). "Though commercial reasonableness must inhere in 'every aspect of the disposition including the method, manner, time, place and terms' (Uniform Commercial Code, § 9-504, subd [3])," the concept of commercial reasonableness lacks further particularization in the code. *(Bankers Trust Co. v Dowler & Co.,* 47 NY2d 128, 134.) "In this connection some authorities suggest that optimizing resale price is the prime objective of the code's default mechanisms and that the other factors listed are merely designed to ensure that the highest price is achieved *(Mercantile Fin. Corp. v Miller,* 292 F Supp 797; White

& Summers, Uniform Commercial Code, § 26-11, pp 987-989; Gilmore, Article 9 of the Uniform Commercial Code —Part V: Default, 7 Personal Fin LQ Rep 4, 7, 9). Others would have commercial reasonableness turn on the procedures employed *(Matter of Zsa Zsa, Ltd.,* 352 F Supp 665, 671, affd mem 475 F2d 1393; cf. Uniform Commercial Code, § 9-507, subd [2] ['(t)he fact that a better price could have been obtained * * * is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner']).'' *(Bankers Trust Co. v Dowler & Co., supra,* p 135.) In recognizing these two lines of authority and the test of commercial reasonableness developed under each, the Court of Appeals applied both tests in *Bankers Trust (supra)* and, of necessity, accepted both as valid. Therefore, if the commercial reasonableness of a post-default disposition of collateral is questioned under what may be called the "proceeds" or "procedures" test, the secured party must be put to his proof, since on the issue of commercial reasonableness the burden is on the secured creditor. (See *Transport Equip. Co. v Guaranty State Bank,* 518 F2d 377; Uniform Commercial Code: Burden of Proof as to Commercially Reasonable Disposition of Collateral, Ann., 59 ALR3d 369.)

Under the "proceeds" test, a secured creditor's motion for summary judgment would fail if an issue of fact remained as to whether the optimum sale price had been obtained on a postdefault disposition of collateral.

Under the "procedures" test, if it were not beyond question that collateral had been disposed of without procedural impropriety, an issue of fact would remain concerning commercial reasonableness. However, under this line of authority that would hold that the primary focus of commercial reasonableness is not the *proceeds* received from the sale but, rather, the *procedures* employed, a narrow exception has been developed. It is acknowledged that, even where procedural propriety has been observed, a *"wide* discrepancy between the sale price and the value of the collateral signals a need for close scrutiny" *(Matter of Zsa Zsa Ltd.,* 352 F Supp 665, 671, affd 475 F2d 1393; emphasis added). "Commercially reasonable" has been construed "to mean that the qualifying disposition must be made in the

good faith attempt to dispose of the collateral to the parties' mutual 'best advantage' (see *Old Colony Trust Co. v Penrose Ind. Corp.*, 280 F Supp 698, 714, affd 398 F2d 310; see, also, *Matter of Zsa Zsa Ltd.*, 352 F Supp 665) and that, while the mere 'fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not *of itself* sufficient to establish that the sale was *not* made in a commercially reasonable manner' (Uniform Commercial Code, § 9-507, subd [2]; emphasis supplied), marked discrepancies between the disposal and sale prices signal a need for closer scrutiny, especially where, as here, the possibilities for self-dealing are substantial (see, e.g., *Jefferson Credit Corp. v Marcano*, 60 Misc 2d 138)." *(Central Budget Corp. v Garrett*, 48 AD2d 825-826.) Thus, under that line of authority emphasizing the procedural aspects of commercial reasonableness, even though a seemingly low return of resold collateral may not be sufficient to raise an issue of fact on the question of commercial reasonableness *(Matter of Zsa Zsa Ltd., supra*, p 671), evidence of a *wide* or *marked* discrepancy between sale and disposal prices will be enough to raise such an issue for the jury, and to defeat a secured party's motion for summary judgment on the question of damages.[8]

In the case at bar, the disposal price of the collateral was approximately 10% of its original sale price. The only indication of its value at or about the time of resale was an inconclusive statement by the Bankruptcy Court, in its order releasing the collateral, that the realizable value of the six knitting machines was less than the amount due and owing the secured creditor, FDIC (approximately $73,-000). This could hardly have been considered proof that the six knitting machines had substantially depreciated in value

8. In both *Matter of Zsa Zsa Ltd.* (352 F Supp 665, affd 475 F2d 1393), and *Central Budget Corp. v Garrett* (48 AD2d 825), it was held that close scrutiny is required when there are wide or marked discrepancies between disposal and sale prices, *especially when there is evidence of self-dealing*. It should be noted that this language does not imply that evidence of self-dealing must be present to warrant close scrutiny, but only that, if present, it will *increase* the need for such scrutiny. Therefore, it must be concluded that a wide or marked discrepancy in disposal and sale prices is an independently adequate reason to question the commercial reasonableness of a disposition of collateral under section 9-504 of the Uniform Commercial Code.

(i.e., by approximately 90%) so as to sufficiently explain and justify the low return realized upon their disposal. Thus, there was still to be shown a commercially reasonable explanation and justification for the wide or market discrepancy between disposal and sale prices. Moreover, plaintiff had failed to show that the disposal price had been the highest price it could have achieved under the circumstances. Consequently, even if the collateral's resale was shown to be procedurally proper, so as to resolve the factual issue of commercial reasonableness under the general rule of the "procedures" test, such a resolution is not conclusive on this issue. When the collateral's disposal price is measured in terms of the highest price available under the "proceeds" test, or according to the wide discrepancy exception under the "procedures" test, the commercial reasonableness of the collateral's disposal by FDIC remains a question of fact to be determined at trial. Wherefore, Special Term should have denied plaintiff summary judgment on the issue of damages.

Accordingly, we modify the grant of summary judgment to the extent that it awarded damages in favor of plaintiff against defendants-appellants, and remand for further proceedings consistent herewith. At trial, the commercial reasonableness of the postdefault disposition of the collateral will be a question of fact to be determined in resolving the issue of damages.

MOLLEN, P. J., HOPKINS and LAZER, JJ., concur.

Appeal from an order of the Supreme Court, Nassau County, dated January 11, 1980, dismissed. No appeal lies from an order denying a motion for reargument.

Order of the same court, dated November 14, 1979 and resettled on February 4, 1980, modified, on the law, by deleting the provisions (1) directing entry of a money judgment against defendants Leonard Machinery Corp. and Concord Fabrics, Inc., and (2) directing an assessment as to attorney's fees payable by said defendants. As so modified, order, as resettled, affirmed insofar as appealed from.

Judgment of the same court, entered January 17, 1980, modified, on the law, by deleting the provisions (1) award-

ing plaintiff a money judgment against defendants Leonard Machinery Corp. and Concord Fabrics, Inc., and (2) directing an assessment as to attorney's fees payable by said defendants. As so modified, judgment affirmed insofar as appealed from and case remitted to the Supreme Court, Nassau County, for further proceedings consistent with the opinion herein.

Plaintiff is awarded one bill of $50 costs and disbursements payable jointly by appellants.