OPINION OF THE COURT
Jack M. Battaglia, J.
On October 21, 2002, Jason Coxall and Utho Coxall purchased a 1991 model Lexus automobile, executing a Security Agreement/Retail Installment Contract. The “cash price” on the contract was $8,100, against which the Coxalls made a “cash down payment” of $3,798.25 and financed the balance of $4,970. Apparently simultaneously with the sale, the contract was assigned to Clover Commercial Corp., whose name was printed on the top and at other places. Although Majestic Capital Inc. is designated as the “Seller” and “Dealer” in the assignment, at trial the parties referred to the seller of the automobile as Jafas Auto Sales. Title to the vehicle was put in Jason Coxall’s name.
The Coxalls were required by the contract to make monthly payments of $333.68 each, beginning November 21, 2002. No payments were made, however, because Jason Coxall experienced mechanical difficulties with the vehicle soon after purchase. On February 19, 2003, Clover Commercial took possession of the vehicle, and on the next day mailed two letters to Jason Coxall; in one, Clover told Mr. Coxall that he could redeem the vehicle with a payment of $5,969.28, exclusive of storage charges and a redemption fee; in the other, Clover gave Mr. Cox-all notice that the vehicle would be offered for private sale after 12:00 noon on March 3, 2003.
On March 3, 2003, the Lexus was sold back to Jafas Auto Sales for $1,500. On April 22, 2003, Clover Commercial wrote to Jason Coxall demanding that he pay a “remaining balance” of $4,998.09.
Jason Coxall commenced action No. 1 with a summons with endorsed complaint dated April 29, 2003 that states the nature and substance of the cause of action as “automobile illegally repossed [sic],” and seeks damages of $8,000 with interest from February 19, 2003. Clover Commercial was served on May 2, and filed its answer on May 20. Despite the filing, the action was placed on the Part 12 calendar for inquest to be held on June 27.
Meanwhile, with a summons and verified complaint dated June 16, 2003 and filed on June 25, Clover Commercial com *656 menced action No. 2 against Jason Coxall and Utho Coxall, seeking $4,630.62 with interest from October 21, 2002 plus reasonable attorney fees. The verified complaint alleges that “[pjlaintiff is the holder for value of a promissory instrument dated 10/21/02 duly executed and delivered and/or guaranteed by the defendant(s).” These documents show Clover Commercial’s attorney to be E. Hope Greenberg, the same attorney who signed Clover’s answer in action No. 1 approximately one month earlier.
The inquest scheduled in action No. 1 was not held. Someone appeared for Clover Commercial on that day, and made an oral application that the inquest be vacated in light of the timely answer. The motion was granted, and the action was adjourned on the Part 11 calendar for trial on August 11, 2003.
On August 7, 2003, Clover Commercial filed with the clerk an application for a default judgment in action No. 2, alleging that the defendants, Jason and Utho Coxall, had not appeared in the action. The application, as well as the attached affirmation that the application was not frivolous, was signed by E. Hope Green-berg. A default judgment was entered on September 17, 2003 for a total of $5,680.04.
On the August 11, 2003 trial date for action No. 1, the presiding judge adjourned the matter to December 4. There is no indication that the judge was advised of action No. 2 and the application for default judgment made just several days earlier. On December 4, action No. 1 was adjourned to March 18, 2004, so that Jason Coxall could move to vacate the default judgment against him in action No. 2. Jason Coxall so moved, and in a “so ordered” stipulation dated December 17, Clover Commercial consented to vacating the default judgment. In the stipulation, the parties agreed to consolidate action No. 1 and action No. 2 for trial on March 18, 2004. The stipulation did not, however, call for Mr. Coxall to file and serve an answer in action No. 2, and he did not. Given the identity of subject matter in the two actions, the court treats Mr. Coxall’s endorsed complaint in action No. 1 as an answer with counterclaim in action No. 2.
Trial was held on March 18. Clover Commercial was represented by Alan Levin, Esq., and Adam Greenberg and Lynval Wittaker testified on its behalf. Jason Coxall appeared and testified, but Utho Coxall did not. Although the December 17 stipulation is not clear on the point, the court considers the default judgment entered on September 17, 2003 vacated as to Utho, as well as Jason, particularly in light of the circumstances under *657 which it was obtained. Utho did not appear at trial, however, and it is deemed an inquest as to him.
The enforcement of Clover Commercial’s security interest in Mr. Coxall’s Lexus is governed by article 9 of the Uniform Commercial Code. An extensively revised article 9 became effective in New York on July 4, 2001 and applies to these actions. Revised article 9 makes significant changes in the law as it applies to the respective rights and obligations of the Coxalls and Clover Commercial. Under both former and revised article 9, however, if the Coxalls defaulted under the contract, Clover was entitled to take possession of its collateral, the Lexus, and it could proceed without judicial process, if it could obtain possession without breach of the peace. (See UCC 9-609; see also former UCC 9-503.) There was no evidence at trial that Clover breached the peace in taking possession of the vehicle.
Default
No payments other than the down payment were made under the contract. Unless, therefore, the Coxalls were for some reason relieved of the obligation to make payments, they were in default, and Clover Commercial could seek its remedy. Except for the mechanical difficulties that Mr. Coxall experienced with the vehicle, he did not testify to any other reason a finding of default would not be warranted, and the court’s review of the contract reveals none.
The contract states that any “holder” of it, which would include Clover Commercial, is “subject to all claims and defenses which the debtor could assert against the seller of goods . . . obtained pursuant hereto or with the proceeds hereof.” If, therefore, the Coxalls have a defense against the seller of the Lexus that would avoid payment of the price, they may assert that defense against Clover. Specifically, if the Coxalls may cancel the contract for sale of the vehicle, they would no longer be obligated to pay the purchase price.
The Coxalls may cancel the contract (see UCC 2-711 [1]) if they rightfully and effectively rejected the vehicle (see UCC 2-601, 2-602), or if, after acceptance (see UCC 2-606), they rightfully and effectively revoked their acceptance (see UCC 2-608). If they have not rejected or revoked acceptance, they must pay the purchase price (see UCC 2-607 [1]).
Subject to the express terms of the contract, the right to reject or to revoke acceptance arises when the seller’s tender of the goods fails to conform to the contract, such as when there is a *658 breach of an express or implied warranty. At trial, Mr. Coxall did not prove any express warranty that he received on his purchase of the Lexus, but there are statutory warranties that are mandated on the sale of used automobiles (see General Business Law § 198-b; Vehicle and Traffic Law § 417), as well as the more generally applicable implied warranty of merchantability (see UCC 2-314).
Mr. Coxall’s difficulties with the vehicle will be discussed again below. For now, it is enough to say that he did not prove that he rejected the vehicle or revoked acceptance. He returned the vehicle once to Jafas Auto Sales for repairs, but did not go back, even though the problems were not cured. He testified to no statement or conduct that would have communicated to Jafas or Clover Commercial that he wanted to call off the deal. (See Hooper Handling v Jonmark Corp., 267 AD2d 1075, 1076 [4th Dept 1999]; Sears, Roebuck & Co. v Galloway, 195 AD2d 825, 827 [2d Dept 1993]; Ask Techs., Inc. v Cablescope, Inc., 2003 WL 22400201, *3, 2003 US Dist LEXIS 18694, *7 [SD NY, Oct. 20, 2003].) Indeed, his action against Clover is based upon his claim of ownership and right to possession of the vehicle.
After Clover Commercial took possession of the Lexus, it was obligated to deal with the vehicle in accordance with the requirements of article 9. Under former article 9, those requirements were contained in a single section (see former UCC 9-504), and there was much uncertainty about the consequences of the creditor’s failure to comply. Revised article 9 expands greatly upon the statutory requirements, and clears some, but not all, of the uncertainty.
For the secured party who chooses to sell the collateral, article 9 imposes two overriding requirements: the secured party must send “a reasonable authenticated notification of disposition” to the debtor (UCC 9-611 [b]; see also former UCC 9-504 [3]); and the sale must be “commercially reasonable” (UCC 9-610 [b]; see also former UCC 9-504 [3]). The court has determined that Clover Commercial failed to comply with these requirements.
Reasonable Notification
“The purpose of the notice requirement is ‘to give the debtor an opportunity to protect his interest in the collateral by exercising any right of redemption or by bidding at the sale, to challenge any aspect of the disposition before it is made, or to interest potential purchasers in the sale, all to the end that the merchandise not be sacrificed by sale at less *659 than the true value.’ ” (Long Is. Trust Co. v Williams, 133 Misc 2d 746, 753 [Civ Ct, NY County 1986], affd, 142 Misc 2d 4 [App Term, 1st Dept 1988], quoting First Bank & Trust Co. of Ithaca v Mitchell, 123 Misc 2d 386, 393 [Sup Ct, Tompkins County 1984].)
“The notification must be reasonable as to the manner in which it is sent, its timeliness (i.e., a reasonable time before the disposition is to take place), and its content.” (UCC 9-611, Comment 2.) The notification must be “authenticated,” as that term is defined (see UCC 9-102 [a] [7]), a requirement not in issue here.
“[W]hether a notification is sent within a reasonable time is a question of fact.” (UCC 9-612 [a].) “A notification that is sent so near to the disposition date that a notified person could not be expected to act on or take account of the notification would be unreasonable.” (UCC 9-612, Comment 2.) For secured transactions other than consumer transactions, “a notification . . . sent ... 10 days or more before the earliest time of disposition ... is sent within a reasonable time before the disposition.” (UCC 9-612 [b].) The 10-day period for nonconsumer transactions “is intended to be a ‘safe-harbor’ and not a minium requirement.” (UCC 9-612, Comment 3.) The terms “consumer goods,” “consumer-goods transaction” and “consumer transaction” are defined. (See UCC 9-102 [a] [23], [24], [26].)
The contents and form of the notification are prescribed generally for all transactions (see UCC 9-613 [a]) and for consumer-goods transactions (see UCC 9-614 [a]). A notification in a non-consumer transaction that does not include all of the prescribed information may still be found sufficient as a matter of fact. (See UCC 9-613 [b].) But in a consumer transaction, “[a] notification that lacks any of the [prescribed] information . . . is insufficient as a matter of law.” (UCC 9-614, Comment 2.)
Here, Clover Commercial mailed two letters to Jason Coxall on February 20, 2003: one advised primarily as to the time after which the sale would be made, i.e., “12 noon on 3/03/03”; the other advised primarily as to Mr. Coxall’s right to redeem the automobile. Although each of these letters shows a “[c]opy to: Utho Coxall,” there is no evidence of any mailing to him. As to Utho Coxall, therefore, it appears that he may not have been sent any notification; at the least, we do not know when any notification was sent.
The court will assume, for purposes of these actions only, that separate writings that in combination provide to the debtor all *660 of the prescribed information may be found to comply sufficiently with the “reasonable notification” requirement. Even so, and read generously, Clover Commercial’s two letters did not provide Jason Coxall with all of the information it was required to provide. Neither letter stated that Mr. Coxall was “entitled to an accounting of the unpaid indebtedness” nor stated “the charge, if any, for an accounting.” (See UCC 9-613 [a] [4]; 9-614 [a] [1].)
As to Jason Coxall, the post office-stamped certificates of mailing are sufficient to establish that Clover Commercial sent the letters to him, even if he did not receive them. (See American Honda Fin. Corp. v Delorio, 260 AD2d 416, 417 [2d Dept 1999].) First-class mail with certificate of mailing, a manner of service regularly designated by judges of this court for orders to show cause, is a “commercially reasonable manner.” (See UCC 9-612, Comment 3.)
In computing the period of time, the date of mailing, i.e., February 20, should be excluded and the date of sale, i.e., March 3, should be included. (See Fisk Discount Corp. v Brooklyn Taxicab Trans. Co., 270 App Div 491, 499 [2d Dept 1946].) Mr. Coxall was given, therefore, 11 days’ notice before his Lexus was sold. In a consumer transaction, and in the absence of any evidence that such a prompt sale was important to obtaining the best price, 11 days’ notice does not appear reasonable. Although the period of notification is measured from mailing, in other areas the law recognizes that time will elapse between mailing and receipt. (See CPLR 2103 [b] [2] [adding five days to prescribed period of time when service is by mail].) Were notification of sale to be received, say, five days before sale, the opportunity to arrange, for example, for alternate financing to redeem a necessary item such as an automobile would be quite limited.
But the contract between the Coxalls and Clover Commercial provides that, after repossession, Clover “can sell the vehicle after 10 days’ notice,” and that “notice will be reasonable if . . . sent ... to your current address ... at least 10 days . . . before seller acts on the notice.” Article 9 would permit such an agreement unless it is “manifestly unreasonable.” (See UCC 9-603 [a]; 9-602 [g].) It is not necessary to a decision in these cases to determine whether the contract notice provision is enforceable, and, in the absence of evidence on the reasonableness of notice by 10 days’ prior mailing, the court will leave the question for another day.
*661 Commercially Reasonable Sale
“Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable.” (UCC 9-610 [b]; see also former UCC 9-504 [3].) Private dispositions, as compared to public auction, are encouraged “on the assumption that they frequently will result in higher realization on collateral for the benefit of all concerned.” (UCC 9-610, Comment 2.) “A disposition of collateral is made in a commercially reasonable manner if the disposition is made ... in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.” (UCC 9-627 [b] [3]; see also former UCC 9-507 [2].)
New York courts have determined commercial reasonableness by whether the secured party “acted in good faith and to the parties’ mutual best advantage.” (See 108th St. Owners Corp. v Overseas Commodities, 238 AD2d 324, 325 [2d Dept 1997]; MTI Sys. Corp. v Hatziemanuel, 151 AD2d 649, 650 [2d Dept 1989]; Federal Deposit Ins. Corp. v Herald Sq. Fabrics Corp., 81 AD2d 168, 184-185 [2d Dept 1981].) When a secured party is seeking a deficiency from the debtor, the secured party bears the burden of proving the sale was commercially reasonable. (See UCC 9-626 [a] [2]; Associates Commercial Corp. v Liberty Truck Sales & Leasing, 286 AD2d 311, 312 [2d Dept 2001]; BancAmerica Private Brands v Marine Gallery, 157 AD2d 813, 813 [2d Dept 1990]; Mack Fin. Corp. v Knoud, 98 AD2d 713, 713-714 [2d Dept 1983].) “Whether a sale was commercially reasonable is, like other questions about ‘reasonableness’, a fact-intensive inquiry; no magic set of procedures will immunize a sale from scrutiny.” (Matter of Excello Press, Inc., 890 F2d 896, 905 [7th Cir 1989] [applying New York law]; see also Federal Deposit Ins. Corp. v Forte, 144 AD2d 627, 629 [2d Dept 1988].)
Here, Clover Commercial sold Mr. Coxall’s Lexus in a private sale to the dealer from whom Mr. Coxall had purchased it. Clover Commercial provided no evidence on its procedure for the sale, its identification of prospective buyers, or any other details of the sale, except for the price. (See Mack Fin. Corp. v Knoud, 98 AD2d at 714.) There was no showing that dealers sell their trade-ins in the same manner or that dealers or secured parties sell repossessed automobiles in the same manner. On the other hand, one court has noted that “the sale of [a] repossessed vehicle by private auto auction is in conformity with the reasonable commercial practices of lenders disposing of *662 motor vehicles.” (Charter One Auto Fin. Corp. v Vaglio, 2003 NY Slip Op 50638[U], *5 [Sup Ct, Nassau County].) This case is different, however, in that the vehicle was sold back to the dealer who sold it to the debtor. (See Central Budget Corp. v Garrett, 48 AD2d 825, 825 [2d Dept 1975]; Jefferson Credit Corp. v Marcano, 60 Misc 2d 138, 143 [Civ Ct, NY County 1969]; see also UCC 9-615 [fl; 9-615, Comment 6; former UCC 9-504 [5].)
All we have, therefore, as evidence of commercial reasonableness is the price. Clover Commercial received $1,500 on the sale of a Lexus that had been purchased by the Coxalls approximately four months earlier for $8,100; that is a sales price of 18.5% of the purchase price.
“The fact that a greater amount could have been obtained by a . . . disposition ... at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the . . . disposition . . . was made in a commercially reasonable manner.” (UCC 9-627 [a]; see also former UCC 9-507 [2].) But “[w]hile not itself sufficient to establish a violation of [code requirements], a low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable.” (UCC 9-627, Comment 2.)
New York courts have, indeed, scrutinized “low price” sales.
“[M]arked discrepancies between the disposal and sale prices signal a need for closer scrutiny, especially where, as here, the possibilities for self-dealing are substantial . . . Under these circumstances, we require some affirmative showing that the terms of the disposition were, in fact, commercially reasonable and hold that, in the absence of such a showing, we will be compelled to deny recovery in a suit for a deficiency judgment.” (Central Budget Corp. v Garrett, 48 AD2d at 825-826 [automobile]; see also Orix Credit Alliance v East End Dev. Corp., 260 AD2d 454, 455 [2d Dept 1999]; Kohler v Ford Motor Credit Co., 93 AD2d 205, 208 [3d Dept 1983] [automobile]; Federal Deposit Ins. Corp. v Herald Sq. Fabrics Corp., 81 AD2d at 184-185; Long Is. Trust Co. v Williams, 133 Misc 2d at 751-753 [automobile; reviewing cases].) “[A] wide or marked discrepancy in disposal and sale prices is an inde *663 pendently adequate reason to question the commercial reasonableness of a disposition of collateral.” (Federal Deposit Ins. Corp. v Herald Sq. Fabrics Corp., 81 AD2d at 185 n 8.)
A low price, of course, “might simply reflect a greatly depreciated piece of collateral.” (Matter of Excello Press, Inc., 890 F2d at 905.) But, here, Clover Commercial acknowledged that Mr. Coxall’s Lexus had not sustained any physical damage while in his possession. Clover’s suggestion that the low price may have been due to the mechanical difficulties experienced by Mr. Cox-all was contradicted by its own testimony that the car was running fine when repossessed, and would, in any event, be specious.
As previously indicated, Clover Commercial provided no evidence as to the commercial reasonableness of the sale; it provided no evidence that any prospective buyer was contacted, other than the original seller; and provided no evidence of the fair market value of the Lexus on the date of sale, or any other evidence that would justify a sale price of $1,500. In short, Clover Commercial failed to sustain its burden of showing that the sale of Mr. Coxall’s Lexus was commercially reasonable.
Deficiency
When the secured party has disposed of the collateral in a commercially reasonable manner after sending reasonable notification to the debtor, the debtor will be liable for any deficiency if the proceeds of the disposition are not sufficient to satisfy the debt and allowed expenses. (See UCC 9-615 [d]; see also former UCC 9-504 [2].) Former article 9 was silent, however, on whether the secured party that had failed to send reasonable notification or had not disposed of the collateral in a commercially reasonable manner — or both, as here — could obtain a deficiency judgment against the debtor.
“Three general approaches emerged. Some courts have held that a noncomplying secured party may not recover a deficiency (the ‘absolute bar’ rule). A few courts held that the debtor can offset against a claim to a deficiency all damages recoverable under former Section 9-507 resulting from the secured party’s noncompliance (the ‘offset’ rule). A plurality of courts considering the issue held that the noncomplying secured party is barred from recovering a deficiency unless it overcomes a rebuttable presumption that compliance with former Part 5 would have *664 yielded an amount sufficient to satisfy the secured debt.” (UCC 9-626, Comment 4.)
In New York, the departments of the Appellate Division were not in agreement as to which of the approaches to follow, with the Second Department alone adopting the “absolute bar” rule. (See Central Natl. Bank, Canajoharie v Butler, 294 AD2d 881, 882 [4th Dept 2002]; General Elec. Credit Corp. v Durante Bros. & Sons, 79 AD2d 509, 510 [1st Dept 1980]; Security Trust Co. of Rochester v Thomas, 59 AD2d 242, 245-247 [4th Dept 1977]; Stanchi v Kemp, 48 AD2d 973, 974 [3d Dept 1975]; Central Budget Corp. v Garrett, 48 AD2d at 826; Long Is. Bank v Knight, 122 Misc 2d 878, 879 [App Term, 2d Dept 1983]; Avis Rent-A-Car Sys. v Franklin, 82 Misc 2d 66, 67 [App Term, 2d Dept 1975]; Matter of Excello Press, Inc., 890 F2d at 903-904; Siemens Credit Corp. v Marvik Colour, Inc., 859 F Supp 686, 691-693 [SD NY 1994]; In re Stedman, 264 BR 298, 301-303 [WD NY 2001].) The “absolute bar” rule appears to have been the approach required by pre-code law. (See Leasco Computer v Sheridan Indus., 82 Misc 2d 897, 900 [Civ Ct, NY County 1975].)
Revised article 9 resolves the conflict and uncertainty for transactions other than consumer transactions by adopting the “rebuttable presumption” rule. (See UCC 9-626 [a] [3].) The limitation of the “rebuttable presumption” rule to nonconsumer-transactions “is intended to leave to the court the determination of the proper rules in consumer transactions,” and the court “may continue to apply established approaches.” (UCC 9-626 [b].)
It is clear, therefore, that the “rebuttable presumption” rule is now the law in the Second Department for nonconsumer transactions. The question remains, however, whether the “absolute bar” rule is to be applied in these actions, involving, as they do, a consumer transaction. A review of the legislative history provides no guidance. The report of the New York Law Revision Commission that accompanied revised article 9 through enactment states only that, “[w]ith respect to consumer defaults, Revised Article 9 makes no recommendation whatsoever, leaving the courts free to shape a remedy as is appropriate in each case.” (2001 Report of NY Law Rev Commn on Proposed Revised UCC art 9, at 158.)
Up to now, New York courts have not distinguished between consumer and nonconsumer transactions in fashioning rules where the enforcement provisions of article 9 were silent, suggesting that the “rebuttable presumption” rule will be adopted *665 for all transactions. But at this time, for a court sitting in the Second Department, there is an “absolute bar” rule that has not been legislatively displaced by revised article 9.
Having found, therefore, that Clover Commercial failed to comply with both the reasonable notification and commercially reasonable disposition requirements of article 9, the “absolute bar” rule precludes it from recovering a deficiency from the Coxalls. Even if, however, the “rebuttable presumption” rule were to be applied, the result would be the same. Clover introduced no evidence of “the amount of proceeds that would have been realized had [it] proceeded in accordance with the provisions of’ the code relating to disposition of the collateral. (See UCC 9-626 [a] [3] [B].)
Specifically, Clover Commercial provided no evidence as to the fair market value of the Lexus on the date of the sale, either by reference to “blue book” value, appraisal, sales of similar vehicles or other measure. (See Long Is. Trust Co. v Williams, 133 Misc 2d at 754; see also Central Natl. Bank v Butler, 294 AD2d at 882 [“certified appraised value”]; Kohler v Ford Motor Credit Co., 93 AD2d at 208 [“book value of the vehicle”].) Moreover, Clover’s witness, Adam Greenberg, acknowledged that Clover considered the Lexus to be of sufficient value to serve as collateral for the secured debt, which, at the least, was the amount financed, $4,970.
Although Clover Commercial cannot recover for any deficiency, it may recover “the sums owed to it prior to the repossession as well as the repossession charges.” (See Avis Rent-A-Car Sys. v Franklin, 82 Misc 2d at 67.) Clover’s failure to comply with the enforcement provisions of article 9 “would not discharge the [Coxalls] from all liability under the contract.” (See Stanchi v Kemp, 48 AD2d at 974; see also Bank of China v Chan, 937 F2d 780, 788 [2d Cir 1991].) At the time of repossession, three monthly payments of $333.68 were unpaid for a total due of $1,001.04, and the contract provided for a 10% late charge for each payment not made when due, for an additional charge of $100.11. Clover is entitled, therefore, to $1,101.15 for payments in default and related late charges.
The contract also provides that the debtor must pay the “cost of repossession, storage and preparation for sale” and “an attorney’s fee of up to 15% of the amount due . . . unless the court sets a smaller fee.” Clover Commercial includes $325 in its computation of the deficiency, which apparently is intended as a charge for repossession, storage, and preparation charges, *666 but, unlike the late charge, the amount is not specified in the contract, and no evidence was submitted to explain or support it. Similarly, there was no evidence to support an award of attorney’s fees. (See Orix Credit Alliance v Grace Indus., 261 AD2d 521, 521-522 [2d Dept 1999].)
Coxall’s Claim Against Clover
Jason Coxall no longer has his Lexus. His down payment was $3,798.25, and he owes $1,101.15 for overdue payments. In effect, approximately four months’ use of the vehicle has cost him approximately $5,000, not including alleged repair and towing expenses. Of course, “the debtor who precipitated the sale by defaulting on a debt is certainly not to be freed lightly from fault.” (Siemens Credit Corp. v Marvik Colour, Inc., 859 F Supp at 692.) Nonetheless, does Mr. Coxall have a remedy for Clover Commercial’s failure to comply with article 9, beyond being relieved of any liability for a deficiency?
“Under the common law, prior to the enactment of the Uniform Conditional Sales Act, the seller was under no obligation upon the retaking of the goods on buyer’s default to make return of partial payments or any part thereof.” (Laufer v Burghard, 146 Misc 39, 42 [Sup Ct, Erie County 1932].) “A retaking of the property by a conditional vendor is not a rescission of the contract so as to require the vendor to place the buyer in a former position and return the consideration received under the contract.” (Id. at 45.) If, however, the repossessing seller failed to comply with obligations imposed by statute after taking possession, a return of all or part of the payments made by the buyer was mandated. (See Rivara v James Stewart & Co., 241 NY 259, 262, 267 [1925], affd 274 US 614 [1927]; La Rocca Bldrs. v Sanders, 230 App Div 594, 597 [1st Dept 1930].)
Under article 9, “a person is liable for damages in the amount of any loss caused by a failure to comply” with the statute. (UCC 9-625 [b]; see also former UCC 9-507 [1].) “Damages for violation of the requirements of [the statute] . . . are those reasonably calculated to put an eligible claimant in the position that it would have occupied had no violation occurred.” (UCC 9-625, Comment 3.) There are, however, both supplements to and limitations on this general liability principle.
“[A] debtor . . . whose deficiency is eliminated or reduced under Section 9-626 may not otherwise recover . . . for noncompliance with the provisions . . . relating to . . . enforcement.” (UCC 9-625 [d].) This provision “eliminates the possibility of double recovery or other over-compensation,” but *667 “[b]ecause Section 9-626 does not apply to consumer transactions, the statute is silent as to whether a double recovery or other over-compensation is possible in a consumer transaction.” (UCC 9-625, Comment 3.) Respected commentators “argue that ‘double recoveries’ should be denied in consumer cases too.” (See White and Summers, Uniform Commercial Code § 25-13, at 919 [5th ed 2000].)
The law in New York under former article 9 allowed a debtor to recover any loss resulting from the secured party’s noncompliance, even though the secured party was deprived of recovery for a deficiency because of noncompliance. (See Liberty Bank v Thomas, 222 AD2d 1019 [4th Dept 1995].) Here again, since revised article 9 does not displace existing law for consumer transactions, this court must apply the prerevision law. At the least, denial of a deficiency to the noncomplying secured party should not preclude the debtor’s recovery of the statutorily-prescribed minimum damages. (See In re Angel, 142 BR 194, 198-199 [SD Ohio 1992]; Wilmington Trust Co. v Conner, 415 A2d 773, 781 [Del 1980].)
Revised article 9, like its predecessor, “provides a minimum, statutory, damage recovery for a debtor ... in a consumer-goods transaction” that “is designed to ensure that every noncompliance ... in a consumer-goods transaction results in liability.” (See UCC 9-625, Comment 4; UCC 9-625 [c]; former UCC 9-507 [1].) The debtor may recover “an amount not less than the credit service charge plus 10 percent of the principal amount of the obligation or the time-price differential plus 10 percent of the cash price.” (UCC 9-625 [c] [2].) The statute “does not include a definition or explanation of the terms” used in the damage formula, but “leaves their construction and application to the court, taking into account the . . . purpose of providing a minimum recovery.” (UCC 9-625, Comment 4.)
Here, according to the contract, the time-price differential is $1,036.24 and 10% of the cash price is $810, for a total statutory damage recovery of $1,846.24. Mr. Coxall is entitled to this recovery even if he sustained no actual loss from Clover Commercial’s failure to comply with article 9. (See Davenport v Chrysler Credit Corp., 818 SW2d 23, 31-32 [Tenn Ct App 1991]; Erdmann v Rants, 442 NW2d 441, 443 [ND 1989]; First City Bank-Farmers Branch, Tex. v Guex, 677 SW2d 25, 29 [Tex 1984].) But, although Clover Commercial failed to comply with both the requirement for reasonable notification and the requirement for a commercially reasonable disposition, it is ob *668 ligated for only one statutory damage remedy. (See Dunn v Security Pac. Hous. Servs., 1996 Del Super LEXIS 428, *10-11 [Super Ct, New Castle, Aug. 22, 1996]; Crosby v Basin Motor Co., 83 NM 77, 79, 488 P2d 127, 129 [1971].)
Mr. Coxall would also be entitled to the value of the personal property that, he says, was contained in the vehicle when it was repossessed, but which has not been returned to him. (See Fitzpatrick v Bank of N.Y., 125 Misc 2d 1069, 1076 [Civ Ct, Queens County 1984].) But Mr. Coxall introduced no admissible evidence of that value.
Finally, under the contract, Mr. Coxall could assert against Clover Commercial any claim he might have against Jafas Auto Sales, the seller of the Lexus, for breach of any contractual , or statutory warranty of the vehicle. It cannot be said, however, that such a claim is fairly included within the cause of action asserted in his endorsed complaint for “automobile illegally repossed [sic] $8000.” Mr. Coxall did not present any of the type of expert testimony that would be required to support such a claim, nor did he present documentary evidence that would obviate the need for such testimony. (See CPLR 4533-a.) The court offers no opinion on whether such a claim might be asserted against Clover or Jafas, or both, in a separate action.
The court also notes that, according to the dealer’s assignment, the cash down payment of $3,798.25 was remitted by Jafas to Clover Commercial; that the assignment of the sales contract from Jafas to Clover was “with recourse,” without limitation as to time or amount; and that Clover had the right to demand that Jafas repurchase the sales contract “[i]n the event of a first payment default.”
Disposition
In action No. 1, judgment is rendered in favor of Jason Coxall against Clover Commercial for $745.09, representing the difference between Mr. Coxall’s statutory damages of $1,846.24 and Clover Commercial’s damages for breach of the contract of $1,101.15, with interest from March 3, 2003, plus costs.
In action No. 2, judgment is rendered in favor of Jason Cox-all, dismissing the verified complaint as to him. Any amount due Clover under the contract has been offset against the amount that would otherwise be due to Mr. Coxall in action No. 1. The court recognizes that action No. 1 and action No. 2 were consolidated only for joint trial, but considers the offset and dismissal justified by the relationship between the respective *669 claims under article 9 and as a prophylactic against any mischief of the type that marked the course of proceedings prior to trial. Any action the court might take with respect to the conduct of counsel during those proceedings will be addressed separately.
In action No. 2, judgment is rendered in favor of Clover Commercial against Utho Coxall for $1,101.15, with interest from December 21, 2002, plus costs. Utho Coxall is not a plaintiff in action No. 1, did not answer Clover’s verified complaint, and did not appear for trial. The court offers no opinion on whether Utho Coxall may seek statutory damages or other damages against Clover in a separate action.